# 13-3684

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 13-3684

CENTER FOR CONSTITUTIONAL RIGHTS,

*Plaintiff-Appellant,*

—v.—

CENTRAL INTELLIGENCE AGENCY, DEPARTMENT OF
DEFENSE, DEPARTMENT OF JUSTICE, FEDERAL BUREAU
OF INVESTIGATION, DEFENSE INTELLIGENCE AGENCY,
UNITED STATES SOUTHERN COMMAND,

*Defendants-Appellees,*

DEPARTMENT OF JUSTICE and its Components FEDERAL
BUREAU OF INVESTIGATION and EXECUTIVE OFFICE OF
UNITED STATES ATTORNEYS, DEPARTMENT OF DEFENSE
and its Components DEFENSE INTELLIGENCE AGENCY
and UNITED STATES SOUTHERN COMMAND,
EXECUTIVE OFFICE OF UNITED STATES ATTORNEYS,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## SUPPLEMENTAL APPENDIX

PREET BHARARA,
*United States Attorney for the
Southern District of New York,
Attorney for Defendants-Appellees.*
86 Chambers Street, 3rd Floor
New York, New York 10007
(212) 637-2746

LAWRENCE S. LUSTBERG, ESQ.
JOSEPH PACE, ESQ.
GIBBONS, P.C.
*Attorneys for Plaintiff-
Appellant.*
1 Gateway Center
Newark, New Jersey 07102
(973) 596-4500

# TABLE OF CONTENTS

PAGE

Declaration of Scott Horton, dated April 27, 2005, attached as Exhibit A
    to the Declaration of Deputy Assistant Secretary William Lietzau,
    dated December 20, 2012 (JA 1304 - 1312)..............................................SA-1

Declaration of Marco Sassoli, dated April 28, 2005, attached as Exhibit B
    to the Declaration of Deputy Assistant Secretary William Lietzau,
    dated December 20, 2012 (JA 1304 - 1312)..............................................SA-9

Declaration of Richard B. Jackson, dated May 11, 2006, attached as
    Exhibit C to the Declaration of Deputy Assistant Secretary William
    Lietzau, dated December 20, 2012 (JA 1304 - 1312) ............................SA-15

Memorandum to Commander, Joint Task Force Guantanamo from
    Deputy Secretary of Defense Gordon England, dated June 2, 2006,
    attached as Attachment 1 to the Second Declaration of Mark
    Herrington, dated April 8, 2013 (JA 1335-1337)...................................SA-22

Memorandum for Under Secretary of Defense for Intelligence and Commander,
    Southern Command from Gordon England, dated October 27, 2008,
    attached as Attachment 2 to the Second Declaration of Mark Herrington,
    dated April 8, 2013 (JA 1335 - 1337)....................................................SA-23

# SA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION, CENTER FOR CONSTITUTIONAL RIGHTS, PHYSICIANS FOR HUMAN RIGHTS, VETERANS FOR COMMON SENSE AND VETERANS FOR PEACE, <br><br> *Plaintiffs,* <br><br> v. <br><br> DEPARTMENT OF DEFENSE, AND ITS COMPONENTS DEPARTMENT OF ARMY, DEPARTMENT OF NAVY, DEPARTMENT OF AIR FORCE, DEFENSE INTELLIGENCE AGENCY; DEPARTMENT OF HOMELAND SECURITY; DEPARTMENT OF JUSTICE, AND ITS COMPONENTS CIVIL RIGHTS DIVISION, CRIMINAL DIVISION, OFFICE OF INFORMATION AND PRIVACY, OFFICE OF INTELLIGENCE, POLICY AND REVIEW, FEDERAL BUREAU OF INVESTIGATION; DEPARTMENT OF STATE; AND CENTRAL INTELLIGENCE AGENCY, <br><br> *Defendants.* | DOCKET No. 04-CV-4151 (AKH) <br><br> DECLARATION OF SCOTT HORTON <br><br><br> *Document Electronically Filed* |

Scott Horton, pursuant to 28 U.S.C. § 1746, declares as follows:

1.     I am an attorney at law admitted to practice in the Courts of the State of New York and this Court since 1982. I submit this declaration at the request of plaintiffs for purposes of clarifying the application of the Geneva Conventions to certain issues arising in this litigation. I have neither sought nor received compensation for the preparation of this declaration. I am not a member, affiliate or employee of any party to this litigation.

2.     My essential qualifications are as follows: I studied law at the Universities of Munich and Mainz in Germany and at the University of Texas at Austin, where I received a J.D. degree in 1981. I have practiced law in New York since 1982, first with Cleary, Gottlieb, Steen & Hamilton and, since 1985, with Patterson, Belknap, Webb & Tyler, where I have been a partner since 1990. Throughout my career I have been involved in international humanitarian law matters. In particular, I have been engaged in international relief projects, frequently working alongside the International Committee of the Red Cross ("ICRC") for twenty years in nations across Eurasia and in West Africa. In the course of this work I have regularly stud-

1

# SA-2

ied, spoken on and dispensed advice on questions of international humanitarian law,[1] including principally the application of the Geneva Conventions of 1949 and the Hague Convention of 1907. I have been an adjunct professor at Columbia Law School since 1997 teaching courses in international public and private law and supervising the work of advanced degree students in this area. I currently conduct Columbia Law School's seminar on international humanitarian law issues. I am also Chair of the Committee on International Law of the Association of the Bar of the City of New York, co-chair of the Committee on Human Rights and a director and member of the Executive Committee of the International Law Association.

3.    The purpose of this declaration is to provide an analysis of certain aspects of the Geneva Convention Relative to the Treatment of Prisoners of War ("Third Geneva Convention") and the Geneva Convention Relative to the Protection of Civilian Persons in Time of War ("Fourth Geneva Convention").

4.    While I have not read the record of this case, I have been given oral briefings as to the nature of the litigation. I have been informed that the litigation concerns plaintiffs' request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for, among other things, records concerning the abuse of detainees held by the United States in, Iraq, Afghanistan, and/or Guantánamo Bay. I have also been informed that some of the records responsive to plaintiffs' FOIA request are photographs and videotapes that depict detainees being abused (collectively, "Photographs").

5.    I understand the Defendants have taken the position that, were they to be compelled to produce the Photographs, they would breach their obligations under the Third and Fourth Geneva Conventions.

6.    For the reasons discussed below, I have formed the opinion that the release of the Photographs would be consistent with the Geneva Conventions if the Photographs were altered to ensure that the prisoners depicted would not be individually recognizable. In my view, neither Article 13 of the Third Geneva Convention nor Article 27 of the Fourth Geneva Convention requires a state party to withhold photographic evidence that has been altered in this manner. Conversely, the interests in enforcement of the fundamental purposes of the Third and Fourth Conventions speak strongly in favor of compelling the release of such photographic evi-

---

[1] "International humanitarian law" may be defined as that portion of the Law of Armed Conflict relating to the treatment of civilians and other individuals who have been taken *hors de combat,* and restricting generally the methods and means by which the conflict may be fought.

2

# SA-3

dence (provided it has been altered to obscure individual identities).

## THE GENEVA CONVENTIONS

7.      Common Article 2 of the Third and Fourth Geneva Conventions provides that the Conventions apply "to all cases of declared war or any other armed conflict which may arise between two or more of the High Contracting Parties" and "to all cases of partial or total occupation of the territory of a High Contracting Party."

8.      The Third Geneva Convention addresses protections that must be accorded to "prisoners of war" as defined in Article 4 of that Convention. Article 13 of the Third Geneva Convention states that "[p]risoners of war must at all times be humanely treated" and "at all times be protected, particularly against acts of violence or intimidation and against insults and public curiosity."

9.      The Fourth Geneva Convention addresses protections that must be accorded to "those who, at a given moment and in any manner whatsoever, find themselves, in case of a conflict or occupation, in the hands of a Party to the conflict or Occupying Power of which they are not nationals." Fourth Geneva Convention, Art. 4. Article 27 of the Fourth Geneva Convention states that such individuals "shall at all times be humanely treated, and shall be protected especially against all acts of violence or threats thereof and against insults and public curiosity."

10.      The United States, Afghanistan, and Iraq are states party to the Third and Fourth Geneva Conventions. Belligerents detained by the United States in connection with the conflicts in Afghanistan and Iraq are entitled to protection as prisoners of war under the Third Geneva Convention unless they are properly determined not to be prisoners of war pursuant to the status determination process envisaged in Article 5 of the Third Geneva Convention. Other individuals detained by the United States in connection with these conflicts are entitled to protection under the Fourth Geneva Convention.

## APPLICATION OF THE GENEVA CONVENTIONS TO THE PRESENT CASE

11.      The Geneva Conventions contain no *per se* prohibition on the taking or dissemination of photographs of prisoners of war or protected persons. It is well established that a detaining power may photograph detainees for proper purposes including, for instance, identification, in connection with a criminal investigation, or

3

# SA-4

in connection with a detainee's medical examination and treatment.

12.    Further, photography exposing inhumane conditions at detention centers played a powerful role in the historical development of the Geneva Conventions themselves. Much of the impetus for the restatement of the Geneva Conventions issued in 1949 came from powerful visual images of the survivors of concentration camps maintained by the Germans and Japanese during World War II. Since the Conventions were drafted, journalists and others have used photographs to raise public awareness about violations of the Conventions and to pressure states party to abide by their obligations under the Conventions. The Conventions do not prohibit such photographs. On the contrary, such photographs serve the Conventions' central aim of ensuring that prisoners are treated humanely.

13.    I agree with the view expressed in declarations submitted for Defendants to the effect that photography of detainees may in some circumstances be forbidden by the Conventions and that the dissemination of such photography may be properly restricted. This is particularly true of photographs that depict identifiable prisoners. During the first Gulf War, for example, the Iraqi authorities were reported to have arrested family members of Iraqi soldiers who had been shown on television as prisoners of war; the family members were arrested because Iraqi authorities suspected that the soldiers had deserted their posts and surrendered. *See* Risius & Meyer, *The Protection of Prisoners of War Against Insults and Public Curiosity*, INT'L REV. RED CROSS (Jul.-Aug. 1993) (attached hereto as Exhibit A). The dissemination of photographs that depict individually identifiable prisoners can also cause embarrassment to prisoners who are depicted, particularly if the photographs show prisoners in humiliating or degrading circumstances. Beyond this, as Colonel Risius argues, and facts from the Gulf War bear out, dissemination of identifiable images can endanger the members of their families, who may be subject to reprisal.

14.    The potential for adverse effects of this sort has led some to construe Article 13 of the Third Geneva Convention and Article 27 of the Fourth Geneva Convention to prohibit the dissemination of photographs in which prisoners of war or protected persons are individually identifiable. I consider this approach reasonable and prudent. However, this does not then dictate the outcome the Defendants suggest: withholding the Photographs against an FOIA request. It only suggests the need to modify the Photographs to render the subjects unidentifiable before they are produced.

15.    This construction of the Conventions limits the risk that prisoners and their families will be exposed to retaliation, insult, or public curiosity. It also

1176962v1

# SA-5

limits the risk that prisoners who were maltreated in custody will be humiliated or traumatized by the dissemination of photographs that depict the maltreatment. Importantly, however, this construction does not afford states party a basis for suppressing photographic (or other) evidence that prisoners have been treated inhumanely. It preserves the ability of the media and others to uncover and publicize violations of the Conventions and to use photographic evidence to pressure states party to abide by their legal obligations.

## UNITED STATES PRACTICE UNDER THE GENEVA CONVENTIONS

16.    I am troubled that the submissions of Defendants materially misstate established United States practice on the issue raised. United States practice is consistent with the interpretations set forth above and reflects a correct understanding and application of the language and animating principles of the Geneva Conventions.

17.    I would note as an initial matter that the provisions cited above predate the 1949 restatement of the Geneva Conventions; they were in place under the 1929 Geneva Conventions that governed the Second World War. American armed forces were responsible for the liberation of a number of German and Japanese concentration and prison camps at the end of that war. They followed a consistent practice of carefully documenting the conditions at those camps through photographic means, using soldiers and "embedded" photojournalists to do so. The United States disseminated large volumes of photographs from the liberated camps to media; this included photographs of corpses and remains of prisoners as well as of emaciated and poorly clothed survivors. This photographic evidence was also used with great effect at the prosecutions convened by the United States and its allies or by the United States alone at Nuremberg and at Tokyo at the end of the war. These practices were consistent with the requirements of the Geneva Conventions and were done for proper purposes: exposing and documenting a consistent pattern of abuse by the detaining power, and building public understanding and support for the Geneva Conventions. *See, e.g.*, B. ZELIZER, REMEMBERING TO FORGET: HOLOCAUST MEMORY THROUGH THE CAMERA'S EYE (1998). It is accordingly significant that the United States has historically been a principal expositor of the view that photographic evidence can and should be used to bear witness to the abuse of detainees and for the purpose of seeking justice in their name.

18.    As Defendants note, Department of the Army regulations preclude Army personnel from taking photographs of detainees in the absence of supervision: "Photographing, filming, and video taping of individual EPW [prisoner of war], CI [civilian detainees] and RP [retained personnel] for other than internal Internment

5

# SA-6

Facility administration or intelligence/ counterintelligence purposes is strictly prohibited. No group, wide area or aerial photographs of EPW, CI and RP or facilities will be taken unless approved by the senior Military Police officer in the Internment Facility commander's chain of command." AR 190-8 1-5(d) (Oct. 1997). This measure is a correct implementation of the Geneva Conventions designed to shield detainees from the potential of abuses described above. It is noteworthy that the prohibition on photography is *not* absolute; it makes photography contingent upon the discretion of suitable command authority. Again, this is fully consistent with the text and policies of the Geneva Conventions.

19.    Guidelines adopted by the Department of Defense to govern media access to Guantánamo Bay reflect this construction of the Conventions. The guidelines generally permit photographs of prisoners, with this caveat: "News media coverage, including photo/video coverage, will not identify individual detainees, by name(s) or by image (i.e., close-up images of individual face(s) that would allow individuals to be identified will not be permitted)." *See* Supplemental Public Affairs Guidance ("PAG") on Detainees (Exhibit B to Declaration of Edward R. Cummings), ¶ 2.A.1. The Guidelines state that "the policy on limiting photographs is in accord with treating detainees consistent with the protections provided under the Third Geneva Convention." *Id.* ¶ 6.G.

20.    Similarly, the Defense Department Guidelines for "embedded" media in Iraq permit the taking and dissemination of photographs of enemy prisoners of war, with only this caveat: "[n]o photographs or other visual media showing an enemy prisoner of war or detainee's recognizable face, name tag, or other identifying feature or item may be taken." *See* Memo from Public Affairs Officer to Potential Media Embeds re: Media Embed Informational Package (Exhibit D to Declaration of Edward R. Cummings), ¶ 1(k)(18).

21.    A recent Congressional Research Service report confirms my view that this has been the United States' established practice in implementing the Geneva Conventions. The Report states: "[t]he Department of Defense interprets the provision to protect POWs from being filmed or photographed in such a manner that viewers would be able to recognize the prisoner. Photos and videos depicting POWs with their faces covered or their identities otherwise disguised [do] not, in the view of the Department of Defense, violate GPW art. 13." *See* JENNIFER K. EL-SEA, CONGRESSIONAL RESEARCH SERVICE REPORT FOR CONGRESS: LAWFULNESS OF INTER-ROGATION TECHNIQUES UNDER THE GENEVA CONVENTIONS (Sept. 8, 2004), p. CRS-19.

## SA-7

### ICRC Construction and Practice

22.     In questions of interpretation surrounding the Geneva Conventions, one international organization performs a special charge under the Conventions as their guardian, and as a matter of well-established practice its interpretation is considered to be extraordinarily authoritative.  That organization is the ICRC.

23.     I was disappointed to read in a declaration submitted on behalf of Defendants that "[t]he ICRC generally has taken the view that Article 13 of the Third Geneva Convention requires parties to a conflict to avoid publication of images that show prisoners of war in degrading or humiliating positions *or* allow the identification of individual POWs."  Declaration of Edward R. Cummings, ¶17 (emphasis supplied).  I have worked with ICRC for more than twenty years and have never heard a representative of ICRC express the view cited.  To the contrary, the view I have consistently heard is that such photos *may be disseminated* provided the individuals are not identifiable.  In this manner, a proper balance is struck between the interest in documenting mistreatment of detainees and preserving the dignity of the detainee.

24.     The established United States practice on this issue is consistent with the view of the ICRC.  The Congressional Research Service Report referenced above acknowledges that "[t]he ICRC considers the use of any image that makes a prisoner of war individually recognizable to be a violation" of the Conventions.  *See* Elsea, *supra*, at CRS-19.  With respect to photographs of abuse in particular, the ICRC recently stated, in keeping with its historical construction of the Conventions, that such photographs may be disseminated if faces and identifying features are obscured.  *See Pics "not breaching convention*," South Africa News (May 21, 2004) (attached hereto as Exhibit B).

25.     For these reasons, I have formed the opinion that the dissemination of the Photographs would be consistent with the Geneva Conventions if they were altered to ensure that the prisoners depicted would not be individually recognizable.  In my view, neither Article 13 of the Third Geneva Convention nor Article 27 of the Fourth Geneva Convention categorically prohibits the United States from releasing photographic evidence that prisoners have been maltreated in violation of the Conventions.  On the other hand, dissemination of such photographs may serve the fundamental policy of the Convention that its provisions be enforced by exposing breaches thereof.

# SA-8

I declare under penalty of perjury that the foregoing is true and correct with respect to factual matters within my actual knowledge, and that otherwise it constitutes my opinion fairly formed following due and careful study of the questions presented.

Executed in New York, New York, this 27th day of April, 2005.

Scott Horton

Scott Horton

Scott Horton (RSH 0840)
1133 Avenue of the Americas
New York, New York  10036-6710
(212) 336 2820

1176962v1

# SA-9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION, CENTER FOR CONSTITUTIONAL RIGHTS, PHYSICIANS FOR HUMAN RIGHTS, VETERANS FOR COMMON SENSE AND VETERANS FOR PEACE, <br><br> Plaintiffs, <br><br> v. <br><br> DEPARTMENT OF DEFENSE, AND ITS COMPONENTS DEPARTMENT OF ARMY, DEPARTMENT OF NAVY, DEPARTMENT OF AIR FORCE, DEFENSE INTELLIGENCE AGENCY; DEPARTMENT OF HOMELAND SECURITY; DEPARTMENT OF JUSTICE, AND ITS COMPONENTS CIVIL RIGHTS DIVISION, CRIMINAL DIVISION, OFFICE OF INFORMATION AND PRIVACY, OFFICE OF INTELLIGENCE, POLICY AND REVIEW, FEDERAL BUREAU OF INVESTIGATION; DEPARTMENT OF STATE; AND CENTRAL INTELLIGENCE AGENCY, <br><br> Defendants. | DOCKET NO. 04-CV-4151 (AKH) <br><br> DECLARATION OF MARCO SASSÒLI <br><br><br> *Document Electronically Filed* |

Marco Sassòli, pursuant to 28 U.S.C. § 1746, declares as follows:

1. I am professor of international law at the University of Geneva, Switzerland, and associate professor of international law at the University of Québec in Montreal, Canada. I am also President of the University Center for International Humanitarian Law in Geneva. From 1985 to 1997 I worked with the International Committee of the Red Cross (ICRC), both in the field and at the organization's headquarters in Geneva. While at the ICRC, I served as, inter alia, deputy head of the organization's legal division. I am the author of a treatise, How Does Law Protect in War (ICRC, 1999), and numerous academic articles about the Geneva Conventions and international humanitarian law.

1176277v1

# SA-10

2. The purpose of this declaration is to provide an analysis of certain aspects of the Geneva Convention Relative to the Treatment of Prisoners of War ("Third Geneva Convention") and the Geneva Convention Relative to the Protection of Civilian Persons in Time of War ("Fourth Geneva Convention").

3. It is my understanding that this litigation concerns plaintiffs' request under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, for, among other things, records concerning the abuse of detainees held by the United States in, Iraq, Afghanistan, and/or Guantánamo Bay. I also understand that some of the records responsive to plaintiffs' FOIA request are photographs and videotapes that depict detainees being abused (collectively, "Photographs").

4. I have been informed that the issue before the court is whether the release of the Photographs would be consistent with the United States' obligations under the Third and Fourth Geneva Conventions.

5. For the following reasons, I believe that the release of the Photographs would not be contrary to the Geneva Conventions if the Photographs were altered to ensure that the prisoners depicted would not be individually recognizable.

## FINDINGS OF DECLARANT

6. The Geneva Conventions are intended first and foremost to ensure that prisoners are treated humanely. In reflection of this intent, the Third Geneva Convention, which protects "prisoners of war," states that such prisoners "must at all times be humanely treated" and "at all times be protected, particularly against acts of violence or intimidation and against insults and public curiosity." See Third Geneva Convention,

1176277v1

# SA-11

Art. 13. The Fourth Geneva Convention affords similar protection to all those who "find themselves, in case of a conflict or occupation, in the hands of a Party to the conflict or Occupying Power of which they are not nationals." See Fourth Geneva Convention, Art. 27.

7. Because the United States, Afghanistan, and Iraq are states party to the Third and Fourth Geneva Conventions, "persons having committed belligerent acts" against United States forces in connection with the conflicts in Afghanistan and Iraq and having fallen into the power of the United States are presumptively entitled to protection under the Third Geneva Convention. See Third Geneva Convention, Art. 5. Other individuals detained by the United States in connection with these conflicts are entitled to protection under the Fourth Geneva Convention if they are enemy or neutral nationals.

8. As defendants invoke Article 13 of the Third Geneva Convention and Article 27 of the Fourth Geneva Conventions as a rationale for withholding the Photographs, defendants apparently acknowledge that the individuals depicted in the Photographs are entitled to the protection of one or the other of the Conventions. I am in agreement with the defendants on this point.

9. The prisoners depicted in the Photographs must be protected from insult and public curiosity. This does not mean, however, that the Photographs cannot be released at all. Article 13 of the Third Geneva Convention and Article 27 of the Fourth Geneva Convention have been construed by states party and by the ICRC to prohibit the dissemination of photographs in which prisoners of war or protected persons are individually identifiable. The Conventions do not categorically prohibit the dissemination of photographs of prisoners being abused.

1176277v1

# SA-12

10. The declaration of Edward R. Cummings, submitted by defendants in this litigation, states without citation that the ICRC takes the position that Article 13 of the Third Geneva Convention categorically prohibits states party from disseminating photographs that show prisoners of war in degrading or humiliating positions. See Declaration of Edward R. Cummings, ¶ 17. In fact, as discussed below, ICRC officials have taken the position that such photographs may be disseminated if faces and identifying features are obscured.

11. In 1991, the British Red Cross Society (BRCS) submitted a draft resolution to the 26th International Conference of the Red Cross and Red Crescent interpreting Article 13 of the Third Geneva Convention. The resolution construed Article 13 "as prohibiting the public transmission of images of prisoners of war as individuals, but not forbidding the public transmission of images of prisoners of war who cannot be individually recognized." See Risius & Meyer, supra (emphasis added). The BRCS resolution specifically recognized "the important role of the media in helping to ensure respect for international humanitarian law." Id.

12. More recently, the ICRC was asked to comment on photographs of prisoners being abused by American forces in Iraq. In response, an ICRC spokesperson stated that such photographs may be released if faces and identifying features are obscured. See Pics "not breaching convention," South Africa News (May 21, 2004) (attached hereto as Exhibit A).

13. The Geneva Conventions' proscription against exposing prisoners to "insult and public curiosity" reflects a concern for the prisoner as individual. See Risius & Meyer, supra (noting that BRCS construction of Article 13 "is concerned with prisoners

1176277v1

# SA-13

of war as individuals [and] reflects the understanding . . . that Article 13 is designed to protect individual honour") (emphases added); ICRC, Commentary: IV Geneva Convention Relative to the Protection of Civilian Persons in Time of War, p.200 (stating that Article 27 of the Fourth Geneva Convention reflects "the principle of respect for the human person and the inviolable character of the basic rights of individual men and women") (emphasis added); id. p.201 (stating that Article 27 "covers all the rights of the individual") (emphasis added).

14. In my view, the proscription against exposing prisoners to "insult and public curiosity" does not mean that photographs of prisoners being abused may not be disseminated at all. Rather, it means that photographs of prisoners being abused may not be disseminated if they depict prisoners who are individually recognizable. I am not aware of any academic commentator who has taken a contrary position.

15. The Declaration of Geoffrey S. Corn, submitted by defendants in this litigation, states that the dissemination of the Photographs "would clearly subject the individuals depicted to public curiosity" because "it is almost inconceivable that release of such photographs would not generate renewed public curiosity related to the details depicted in the photographs." See Declaration of Geoffrey S. Corn, ¶ 11. "Public curiosity," however, must be distinguished from public concern. It is probably true that the dissemination of the photographs will generate renewed public concern for prisoners held by United States forces – and, indeed, for prisoners of war and protected persons more generally. The possibility that the Photographs will generate public concern, however, does not mean that their dissemination will violate the Geneva Conventions. In my opinion, it is highly unlikely that those who view the Photographs will view them

1176277v1

## SA-14

with disdain or contempt towards the prisoners depicted. On the contrary, the dissemination of the Photographs is likely to elicit concern for the prisoners depicted and for the treatment of prisoners of war and protected persons more generally.

16. For these reasons, I believe that the dissemination of the Photographs would be not be contrary to with the Geneva Conventions if they were altered to ensure that the prisoners depicted would not be individually recognizable.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of April, 2005.

MARCO SASSOLI
Professeur, Département de droit international public
Faculté de droit
UNI MAIL
Bd du Pont-d'Arve 40
1211 Genève 4
Switzerland

1176277v1

# SA-15

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
By: SARAH S. NORMAND (SN-2834)
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York  10007
Telephone: 212.637.2709
Fax: 212.637.2702

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | ) | |
| ASSOCIATED PRESS, | ) | |
| | ) | |
| | ) | 06 Civ. 1939 (JSR) |
| Plaintiff, | ) | **ECF Case** |
| | ) | |
| v. | ) | |
| | ) | DECLARATION OF |
| DEPARTMENT OF DEFENSE, | ) | RICHARD B. JACKSON |
| et.al., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Richard B. Jackson, pursuant to 28 U.S.C. § 1746, declares as follows:

1. I am an attorney with the Department of the Army.  I am currently the Chief of the Law

of War Branch for the Office of The Judge Advocate General, Headquarters, Department of the

Army, in Rosslyn, Virginia.  My position is also titled Special Assistant to The Judge Advocate

General for Law of War Matters.  I have held this position since September 19, 2005.  Prior to

commencing this position, I was a Colonel in the U.S. Army Judge Advocate General's Corps.

My 30-year military experience includes serving as a Staff Judge Advocate and Legal Advisor in

military operations all over the world, including as a supervisory or responsible attorney for

detainee operations in Panama, Haiti, Bosnia, and Kosovo, as well as Chair of the Department and

# SA-16

Professor of International Law at the U.S. Army Judge Advocate General's School.

2.  In my current capacity as Special Assistant for Law of War Matters, I advise senior officials of the Department of the Army on all matters related to the law of war.  I am also a member of the Department of Defense Law of War Working Group.  The statements contained in this declaration are based upon my personal knowledge and expertise, upon information provided to me in my official capacity, and upon determinations reached and made in accordance therewith.

3.  Due to the nature of my official duties, I am familiar with the policy and practice of the U.S. Armed Forces as they pertain to photographs and other public depictions and displays of prisoners of war (POWs) and detainees.

4.  The purpose of this declaration is to articulate the basis for withholding the production of certain photographs of individuals held at Guantanamo Bay, Cuba, who originally were detained by the U.S. Government in Afghanistan and elsewhere in the armed conflict against Al Qaeda and the Taliban.

## FINDINGS OF DECLARANT

5.  I have personally reviewed a representative sample of the photographs responsive to the AP's FOIA request, and determined that they consist of identification photographs taken of individuals in the custody of U.S. forces, detained during a period of armed conflict in Afghanistan and elsewhere against the Taliban and Al Qaeda.  I believe that the public release of the responsive photographs would violate long-standing DoD policy and practice, and the President's direction on the treatment of detainees.  The public release of the responsive photographs would subject the photographed individuals to public insult, curiosity, embarrassment, unwanted exposure, harassment, and exploitation of their personal images.  Such release would also encourage foreign governments or enemies detaining U.S. service members to subject those service members to similar treatment.

# SA-17

### SUPPORTING ANALYSIS

6. The United States has consistently sought to prevent the public disclosure of photographs and other public depictions and displays that identify individual detainees. For example, Army Regulation 190-8, paragraph 1-5d provides: "Photographing, filming, and video taping of individual [enemy POWs, civilian internees and retained personnel] for other than internal Internment Facility administration or intelligence/counterintelligence purposes is strictly prohibited. No group, wide area or aerial photographs of [enemy POWs, civilian internees and retained personnel] or facilities will be taken unless approved by the senior Military Police officer in the Internment Facility commander's chain of command." Paragraph 1-9 further provides: "In the interest of national security, and the protection of the prisoners from public curiosity, and in adherence to the [Geneva Convention Relative to the Treatment of Prisoners of War (GPW),[1] and the Geneva Convention Relative to the Protection of Civilian Persons in Time of War (GC),[2]], [enemy POWs, civilian internees and retained personnel] and other detainees will not be photographed as per paragraph 1-5d." (Attached as Exhibit A.) AR 190-8 is a multi-service regulation, providing guidance for all U.S. Armed Forces detainee operations; it has been in use continually, incorporating the same basic principles of detainee treatment as a technical manual or a regulation, since World War II. The Department of Defense has disciplined service members who have violated the foregoing, including U.S. soldiers who are being disciplined for committing violations of this regulation in Iraq.

7. The foregoing U.S. Government policy is also reflected in the Department of Defense's guidance concerning media embedded with U.S. military units operating in Iraq. Specifically, DoD guidance provides that "no photographs or other visual media showing an enemy prisoner of war or detainee's recognizable face, name tag, or other identifying feature or item may be taken." It also prohibits "still or video imagery of custody operations or interviews with persons under

---

[1] *Geneva Convention Relative to the Treatment of Prisoners of War*, August 12, 1949, T.I.A.S. 3364 [hereinafter GPW].

[2] *Geneva Convention Relative to the Protection of Civilian Persons in Time of War*, August 12, 1949, T.I.A.S. 3365 [hereinafter GC].

3

# SA-18

custody."[3]  When an embedded photographer violated the policy by taking a photograph of an Iraqi detainee that was published in the New York Times on April 10, 2003, she was removed from the embedded reporter program and the cooperation of her wire services was sought to remove this and other similar photos from distribution.[4]

     8.  In early January 2002, photographs of the in-processing of detainees into Guantanamo were released by DoD public affairs personnel to the media, garnering strong international criticism.  This release was mistakenly believed to be consistent with guidance issued on January 7, 2002, for detainee operations at Guantanamo.  Upon discovery of the release of these photos, the Secretary of Defense issued supplemental guidance on January 11, 2002, to clarify and supersede the previous public affairs guidance.  Under the January 11, 2002 supplemental guidance, which remains in force, photographic and video coverage that allows identification of individual detainees (i.e., close-up images of individual face(s) that would allow individuals to be identified) is specifically prohibited.  Group photographs of detainees may be released provided they comply with the policy on individual detainees; that is, the photographs may not allow individual detainees to be identified.  The January 11, 2002 guidance states:

> 6.G.  The policy of limiting photography is in accord with treating detainees consistent with the protections provided under the [GPW].  This is not a change in policy.  It is in conformity with long-standing U.S. procedures and practice.

> 6.H.  The policy of limiting the release for publication of photography of detainees is consistent with Article 13 of the [GPW]….  While [the] rule [in article 13] does not explicitly forbid the taking of pictures and publication of photographs of such individuals, the United States Government has interpreted it to mean that taking pictures of individual prisoners of war or detainees and publishing them in newspapers or journals would be holding them up to public curiosity and is therefore forbidden.

> 6.I.  The United States has historically forbidden the release of photographs of individual prisoners of war, and has objected when hostile powers have published photographs of, or held press briefings showing detained U.S. military personnel.  (Attached as Exhibit B.)

---

[3] U.S. Marines, I Marine Expeditionary Force, "Media Embed Informational Package" (4 Feb 04), at http://www.iimefpublic.usmc.mil/public/iimefpublic.nsf/DPSByID/04BDD33ECB9A305685256F79005C91A9/$file/I-MEF_MediaEmbedInfoPkg.pdf, (particularly, Enclosure B, para. (k)(18)-(19)).

[4] Susan B. Markisz, *Putting the Media in Soldiers Shoes*, May 2003.  http://www.digitaljournalist.org/issue0305/smarkisz.html.

# SA-19

9.  U.S. Government policies concerning the publication of photographs and other public depictions or displays of detainees date back well before the conflicts in Afghanistan and Iraq and have been consistent over time.  The United States strongly protested public displays of American POWs in Hanoi in July 1966.  At the Empire Range POW Camp in Panama, during Operation Just Cause (1989-1990), I personally advised journalists that they could not take identifiable photographs of detainees, due to relevant DoD policies.  President George H.W. Bush objected to the "brutal parading" of allied pilots by Iraq in January 1991,[5] and the United States made a formal protest to the Government of Iraq because of the "unlawful coercion and misuse of prisoners of war for propaganda purpose, the failure to respect their honor and well-being, and the subjection of such individuals to public humiliation."

10. The United States has continued to object to the public release of photographs of detainees throughout Operation Iraqi Freedom.  In March 2003, Iraqi forces captured U.S. soldiers of the 507 Maintenance Company and broadcast videotape of them being questioned.  Secretary Rumsfeld vigorously protested those actions because:  "[U]nder the Geneva Convention, it's illegal to do things with prisoners of war that are humiliating to those individuals.  And the United States, of course, avoids showing photographs of prisoners of war.  We have thousands of Iraqi prisoners that are in POW camps that we brought along and have erected in country. But we do not -- we avoid showing photographs of them."[6]

11.  Although the President determined on February 7, 2002, that members of Al Qaeda and the Taliban do not qualify as POWs under the GPW, the President also determined that U.S. armed forces will "treat detainees humanely and, to the extent appropriate and consistent with military necessity, in a manner consistent with the principles of Geneva."[7]

---

[5] U.S. Department of State Dispatch, Vol. 2, No. 4 (January 28, 1991), "Iraqi Mistreatment of POW's" (including release of photographs of U.S. Prisoners of War in Iraqi hands) at http://dosfan.lib.uic.edu/erc/briefing/dispatch/1991/html/Dispatchv2no04.html.

[6] Secretary Rumsfeld Interview with Tim Russert, NBC Meet The Press, March 23, 2003, at http://www.dod.mil/transcripts/2003/t03232003_t0323nbc.html.

[7] Presidential Memorandum, dated February 7, 2002, attached as Exhibit C.

# SA-20

12.  As explained in the succeeding paragraphs, when the taking or disclosure of identifying images of detainees would expose them to public curiosity, embarrassment, humiliation, or exploitation, the U.S. Government historically has interpreted the principles of Geneva to mean that the publication of photographs of detainees is forbidden.

13.  With regard to POWs, Article 13 of the GPW requires that a Detaining Power with custody over a POW protect that prisoner of war, "particularly against acts of violence or intimidation and against insults and public curiosity."

14.  With regard to protected persons, GC Article 27 states:

> Protected persons are entitled, in all circumstances, to respect for their persons, their honor, their family rights, their religious convictions and practices, and their manners and customs.  They shall at all times be treated humanely, and shall be protected especially against all acts of violence or threats thereof and against insults and public curiosity.

15.  Article 13 of the GPW and Article 27 of the GC do not expressly address the taking of pictures and publication of photographs of POWs or protected persons.  However, the International Committee of the Red Cross (ICRC) has had a significant influence on the interpretation of the GPW and the GC, including these articles, and has generally taken the view that Article 13 of the GPW requires parties to a conflict to avoid the publication of images that allow the identification of individual POWs.[8]  With regard to Article 27 of the GC, the official ICRC Commentary of the 1949 Geneva Conventions, edited by Jean S. Pictet, provides, "Individual persons' names or photographs, or aspects of their private lives must not be given publicity."[9]  These interpretations are consistent with the ICRC's general focus on preserving the integrity and dignity of individuals in detention and civilians caught up in armed conflict.

16.  As described above, the U.S. Government has historically interpreted GPW Article 13 and GC Article 27 – consistent with the interpretation given by the ICRC – to prohibit the

---

[8] Anthony Dworkin, *The Geneva Conventions and Prisoners of War* (Mar. 4, 2003), available at http://www.crimesofwar.org/special/Iraq/brief_pow.html (citing ICRC spokesman Florian Westphal for the proposition that any photograph "that makes a prisoner of war individually recognizable" violates the conventions).

[9] Jean S. Pictet, *Commentary to the IV Geneva Convention Relative to the Protection of Civilian Persons in Time of War* (1958), at 201.

## SA-21

publication (in newspapers or journals for example) of photographs of identifiable detainees, because publication of such photographs would be holding the detainees up to public curiosity.

17.  Moreover, the U.S. Government has a compelling interest in protecting U.S. service members who may become POWs, or otherwise be detained, from activities of foreign governments and detaining powers that would violate the GPW, including the publication of photographs that identify individual detainees and the public display of POWs and detainees. Publication of the photographs under consideration in this case would significantly undermine the ability of the United States to reasonably object to such activities by foreign detaining powers.

18.  In conclusion, given my review of a representative sample of the photographs in question, I believe that the public release of these photographs that identify individual detainees would conflict with long-standing U.S. policy and practice, and the President's directive on the treatment of detainees.  The photographs permit identification of individual detainees whom the President has determined are to be treated, to the extent appropriate and consistent with military necessity, in a manner consistent with the principles of the Geneva Conventions.  In addition, release of the photographs would have a deleterious effect on the U.S. Government's ability to protect U.S. service members from similar treatment in the future.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of May 2006.


RICHARD B. JACKSON
Chief, Law of War Branch
Office of The Judge Advocate General
Headquarters, Department of the Army
Rosslyn, VA

7

## SA-22



**DEPUTY SECRETARY OF DEFENSE**
1010 DEFENSE PENTAGON
WASHINGTON, DC 20301-1010

MEMORANDUM TO COMMANDER, JOINT TASK FORCE-GUANTANAMO

SUBJECT: Classification of Photographs of Individuals Detained at Guantanamo

Pursuant to my authority under Section 1.7(d) of Executive Order 12958, as amended, I have determined that all photographs that clearly identify the face of an individual currently or formerly detained by the Department of Defense at Guantanamo are classified SECRET. I direct that the Security Classification Guide for Joint Task Force-Guantanamo dated September 21, 2005, be amended to reflect this decision.

I have determined that the unauthorized disclosure of these photographs reasonably could be expected to cause serious damage to the national security of the United States.

Date: June 2, 2006

Gordon England
Deputy Secretary of Defense



**SA-23**



**DEPUTY SECRETARY OF DEFENSE**
1010 DEFENSE PENTAGON
WASHINGTON, DC 20301-1010

OCT 2 7 2008

MEMORANDUM FOR UNDER SECRETARY OF DEFENSE FOR INTELLIGENCE
COMMANDER, U.S. SOUTHERN COMMAND

SUBJECT: Photographs of Individuals Detained at Guantanamo

Pursuant to my authority under Section 1.3 of Executive Order 12958, "Classified National Security Information," as amended, and DoD Directive 5105.02, "Deputy Secretary of Defense," I delegate authority and assign responsibility to Commander, USSOUTHCOM to declassify, on a case-by-case basis and in coordination with other U.S. Government agencies and organizations whose operations may be affected by a classification decision, the photographs of individuals currently or formerly detained by the Department of Defense at the Guantanamo Bay Detention Facility. Commander, USSOUTHCOM may redelegate this authority in writing to a General/Flag Officer within USSOUTHCOM. No further delegation is authorized.

A decision to declassify shall occur when the information no longer meets the classification requirements of Executive Order 12958, as amended, and the damage to national security can no longer be identified or described. The Under Secretary of Defense for Intelligence will establish an appeals process to handle challenges to declassification decisions.

The Commander, USSOUTHCOM may authorize the use of declassified detainee photographs for any lawful purpose, including for use in Military Commission trials and for border patrol and "watchlist" purposes. In addition, the International Committee of the Red Cross may be permitted to photograph detainees who agree to be photographed and whose likenesses have been declassified, for the limited purpose of including these photographs in Red Cross Messages.

Once these photographs have been declassified, they will no longer be exempt from public disclosure under Freedom of Information Act (FOIA) exemption 1 (information that is currently and properly classified). They may thereafter be withheld from the public only if they qualify for one or more of the remaining eight FOIA exemptions.

Gordon England

cc:
Chairman of the Joint Chiefs of Staff
Undersecretary of Defense for Policy
Inspector General of the Department of Defense