# 13-3684

*To Be Argued By*:
TARA M. LA MORTE

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 13-3684

◄•••►

CENTER FOR CONSTITUTIONAL RIGHTS,

*Plaintiff-Appellant*,

—v.—

CENTRAL INTELLIGENCE AGENCY, DEPARTMENT OF
DEFENSE, DEPARTMENT OF JUSTICE, FEDERAL BUREAU
OF INVESTIGATION, DEFENSE INTELLIGENCE AGENCY,
UNITED STATES SOUTHERN COMMAND,

*Defendants-Appellees*,

(*caption continued on inside cover*)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES

PREET BHARARA,
*United States Attorney for the
Southern District of New York*,
*Attorney for Defendants-Appellees.*
86 Chambers Street, 3rd Floor
New York, New York 10007
(212) 637-2746

TARA M. LA MORTE,
EMILY E. DAUGHTRY,
BENJAMIN H. TORRANCE,
 *Assistant United States Attorneys*,
 *Of Counsel.*

DEPARTMENT OF JUSTICE and its Components FEDERAL
BUREAU OF INVESTIGATION and EXECUTIVE OFFICE OF
UNITED STATES ATTORNEYS, DEPARTMENT OF DEFENSE
and its Components DEFENSE INTELLIGENCE AGENCY
and UNITED STATES SOUTHERN COMMAND,
EXECUTIVE OFFICE OF UNITED STATES ATTORNEYS,

*Defendants.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Jurisdictional Statement . . . . . . . . . . . . . . . . . . . . . .  4

Issue Presented for Review . . . . . . . . . . . . . . . . . . .  4

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . .  4

    A.   Procedural Background . . . . . . . . . . . . . . .  4

    B.   Factual Background . . . . . . . . . . . . . . . . . .  5

        1.   The FOIA Requests and the
            Responsive Records . . . . . . . . . . . . . . . .  5

        2.   The Government's Basis for
            Withholding the Responsive Records . .  7

    C.   The District Court's Decision . . . . . . . . . . .  9

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . .  12

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . .  15

POINT I— The Government Properly Withheld
        Classified Videotapes and Photographs of
        al Qahtani Under FOIA Exemption 1 . . . . . . .  15

    A.   Legal Standard for Asserting FOIA
          Exemption 1 . . . . . . . . . . . . . . . . . . . . . . . .  15

ii

PAGE

B.  The Government Has Met Its Burden to
    Show the Withheld Records Are Exempt
    Under Exemption 1. . . . . . . . . . . . . . . . . . .   22

    1.  The Government Has Logically and
        Plausibly Established That Release
        of the Withheld Videotapes and
        Photographs Could Reasonably Be
        Expected to Harm National Security
        by Inciting Anti-American Violence
        and Endangering Lives . . . . . . . . . . .   23

    2.  The Government Has Logically and
        Plausibly Established That Release
        of the Withheld Videotapes and
        Photographs Could Reasonably Be
        Expected to Harm National Security
        by Facilitating Retribution Against
        al Qahtani and Compromising
        Relationships with Cooperative
        Detainees . . . . . . . . . . . . . . . . . . . . . . .   34

    3.  The Government Has Logically and
        Plausibly Established That Release
        of the Withheld Videotapes and
        Photographs Could Reasonably Be
        Expected to Harm National Security
        by Undermining U.S. Diplomatic and
        Military Relationships and
        Facilitating the Sending of Coded
        Messages by Detainees . . . . . . . . . . .   39

iii

PAGE

4.  The Government Has Established
    Logical and Plausible Reasons for
    Withholding the FCE Videotape . . . . .  43

5.  The Classified Herrington
    Declaration Logically and Plausibly
    Establishes That Release of the
    Debriefing Videotapes Could
    Reasonably Be Expected to Harm
    National Security . . . . . . . . . . . . . . . . .  46

POINT II—If the Court Does Not Affirm on the Basis
    of FOIA Exemption 1, It Should Remand to the
    District Court to Rule on Other FOIA
    Exemptions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  51

iv

# TABLE OF AUTHORITIES

*Cases*:

*ACLU v. DoD*, 543 F.3d 59 (2d. Cir. 2008),
  *vacated*, 558 U.S. 1042 (2009) . . . . . . . . . . . . . . . 32

*ACLU v. DoD*,
  628 F.3d 612 (D.C. Cir. 2011). . . . . . . . . . . . *passim*

*ACLU v. DoD*,
  723 F. Supp. 2d 621 (S.D.N.Y. 2010) . . . . . . . . . 44

*ACLU v. DOJ*,
  681 F.3d 61 (2d Cir. 2012) . . . . . . . . . . . . . . *passim*

*Alfred A. Knopf, Inc. v. Colby*,
  509 F.2d 1362 (4th Cir. 1975) . . . . . . . . . . . . . . . 21

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009). . . . . . . . . . . . . . . . . . . . . . . 20

*Ass'n of Retired Railroad Workers, Inc. v. U.S.*
  *Railroad Retirement Bd.*,
  830 F.2d 331 (D.C. Cir. 1987). . . . . . . . . . . . . . . 17

*Associated Press v. DoD*,
  462 F. Supp. 2d 573 (S.D.N.Y. 2006) . . .  35, 36, 38

*Associated Press v. DoD*,
  554 F.3d 274 (2d. Cir. 2009) . . . . . . . . . . . . . . . . . 51

*Center for Nat'l Security Studies v. DOJ*,
  331 F.3d 918 (D.C. Cir. 2003). . . . . . . . . . . . . 19, 29

*CIA v. Sims*,
  471 U.S. 159 (1985). . . . . . . . . . . . .  17, 21, 22, 35

v

PAGE

*Diamond v. FBI,*
   707 F.2d 75 (2d Cir. 1983) . . . . . . . . . .   19, 21, 30

*Disabled in Action v. Hammons,*
   202 F.3d 110 (2d Cir. 2000) . . . . . . . . . . . . . . . . 19

*Fitzgibbon v. CIA,*
   911 F.2d 755 (D.C. Cir. 1990) . . . . . . . . . . . . . . 17

*Frugone v. CIA,*
   169 F.3d 772 (D.C. Cir. 1999) . . . . . . . . . . . . . . 18

*Gardels v. CIA,*
   689 F.2d 1100 (D.C. Cir. 1982) . . . . . . . . . . . . . 30

*Halperin v. CIA,*
   629 F.2d 144 (D.C. Cir. 1980) . . . . . . . . . . . 17, 21

*Halpern v. FBI,*
   181 F.3d 279 (2d Cir. 1999) . . . . . . . . . . . . . . . 19

*Hayden v. NSA,*
   608 F.2d 1381 (D.C. Cir. 1979) . . . . . . . . . . . . . 47

*Herrmann v. Moore,*
   576 F.2d 453 (2d Cir. 1978) . . . . . . . . . . . . . . . 50

*In re New York Times Co.,*
   577 F.3d 401 (2d Cir. 2009) . . . . . . . . . . . . . . . 47

*International Counsel Bureau v. DoD,*
   723 F. Supp. 2d 54 (D.D.C. 2010) . . . . . . . . . . . 45

*International Counsel Bureau v. DoD,*
   906 F. Supp. 2d 1 (D.D.C. 2012) . . . . . .   31, 43, 45

*Judicial Watch v. DoD,*
   715 F.3d 937 (D.C. Cir. 2013) . . . . . .   20, 24, 30, 31

vi

PAGE

*Judicial Watch v. DoD,*
    857 F. Supp. 2d 44 (D.D.C. 2012) . . . . . . . . . 31, 38

*Krikorian v. Dep't of State,*
    984 F.2d 461 (D.C. Cir. 1993). . . . . . . . . . . . . 19, 47

*Larson v. Dep't of State,*
    565 F.3d 857 (D.C. Cir. 2009). . . . . . . . . . . . . 16, 20

*Maynard v. CIA,*
    986 F.2d 547 (1st Cir. 1993). . . . . . . . . . . . . . . . 47

*Military Audit Project v. Casey,*
    656 F.2d 724 (D.C. Cir. 1981). . . . . . . . . . . . . . . 21

*Morley v. CIA,*
    508 F.3d 1108 (D.C. Cir. 2007). . . . . . . . . . . . . . 21

*Students Against Genocide v. Dep't of State,*
    257 F.3d 828 (D.C. Cir. 2001). . . . . . . . . . . . . . . 29

*Tolbert v. Queens College,*
    242 F.3d 58 (2d Cir. 2001) . . . . . . . . . . . . . . . . . 50

*Weberman v. NSA,*
    668 F.2d 676 (2d Cir. 1982) . . . . . . . . . . . . . . . . 47

*Weissman v. CIA,*
    565 F.2d 692 (D.C. Cir. 1977). . . . . . . . . . . . . . . 19

*Wilner v. NSA,*
    592 F.3d 60 (2d Cir. 2009) . . . . . . . . . . . . . *passim*

*Wilson v. CIA,*
    586 F.3d 171 (2d Cir. 2009) . . . . . . . . . . . . . . . . 44

*Wit v. Berman,*
    306 F.3d 1256 (2d Cir. 2002) . . . . . . . . . . . . . . . 50

vii

PAGE

*Wolf v. CIA,*
    473 F.3d 370 (D.C. Cir. 2007). . . . . . . . . . . . . 17, 44

*Yee v. City of Escondido,*
    503 U.S. 519 (1992). . . . . . . . . . . . . . . . . . . . . . . 50

*Statutes*:

5 U.S.C. § 552 . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

10 U.S.C. § 130b . . . . . . . . . . . . . . . . . . . . . . . . . 9, 48

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Other Authorities*:

Executive Order 13,526, 75 Fed. Reg. 707
    (Dec. 29, 2009). . . . . . . . . . . . . . . . . . . . . . . . . *passim*

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 13-3684

———————

CENTER FOR CONSTITUTIONAL RIGHTS,

*Plaintiff-Appellant,*

—v.—

CENTRAL INTELLIGENCE AGENCY, DEPARTMENT OF
DEFENSE, DEPARTMENT OF JUSTICE, FEDERAL BUREAU
OF INVESTIGATION, DEFENSE INTELLIGENCE AGENCY,
UNITED STATES SOUTHERN COMMAND,

*Defendants-Appellees,*

DEPARTMENT OF JUSTICE AND ITS COMPONENTS FEDERAL
BUREAU OF INVESTIGATION AND EXECUTIVE OFFICE FOR
UNITED STATES ATTORNEYS, DEPARTMENT OF DEFENSE
AND ITS COMPONENTS DEFENSE INTELLIGENCE AGENCY
AND UNITED STATES SOUTHERN COMMAND, EXECUTIVE
OFFICE FOR UNITED STATES ATTORNEYS,

*Defendants.*

———————

**BRIEF FOR DEFENDANTS-APPELLEES**

———————

## Preliminary Statement

Plaintiff-appellant the Center for Constitutional
Rights ("CCR") appeals from a September 17, 2013,

2

judgment of the United States District Court for the Southern District of New York (Naomi Reice Buchwald, J.), entered pursuant to a memorandum and order that granted summary judgment to defendants-appellees the Department of Defense ("DoD") and its components, the Federal Bureau of Investigation ("FBI"), and the Central Intelligence Agency ("CIA") (collectively, the "government").

In response to a Freedom of Information Act ("FOIA") request from CCR for certain images of Mohammed al Qahtani, a detainee held by the United States at Guantánamo Bay, Cuba, the FBI and DoD identified fifty-six separate classified videotapes and six classified photographs. The government withheld these documents pursuant to several FOIA exemptions, including Exemption 1, which allows the government to withhold records that are properly classified because their release could reasonably be expected to harm national security. In support of its Exemption 1 withholdings, DoD submitted six declarations, four of which affirmed that the videotapes and photographs were properly classified, and provided separate and independent reasons that their public disclosure could reasonably be expected to cause harm to national security. Three of these declarations were submitted on the public record, and addressed all of the videotapes and photographs at issue. One classified declaration, which addressed only two of the videotapes, was submitted for the district court's review ex parte.

The district court properly deferred to DoD's assessment of the potential for harm to national securi-

3

ty, concluding that the government had met its bur-
den to show that the records are exempt under FOIA
by offering logical and plausible predictions of harm.
Indeed, considering the specific circumstances of al
Qahtani's case, the district court determined that
DoD's explanation that images of al Qahtani may be
used to incite anti-American sentiment, or could
compromise the government's efforts to attain coop-
eration from other Guantánamo detainees, was par-
ticularly convincing. And the district court correctly
rejected CCR's claims that DoD routinely and indis-
criminately releases detainees' images, concluding
that the only disclosures of images of identifiable de-
tainees occurred in narrow circumstances that are
not relevant to this case. The court was also correct in
dismissing CCR's conjecture that the government was
concealing illegality as unfounded and inaccurate.
Additionally, while the district court did not need to
reach these issues, the government logically and
plausibly supported its claims that other harms to
U.S. national security would be reasonably likely to
occur if the images at issue were disclosed: that the
United States' commitment to the Geneva Conven-
tions could be called into question, causing damage to
diplomatic relations; that detainees could use re-
leased images to transmit illicit messages; and that
they could use certain videos to attempt to thwart
military techniques against resistance. The district
court was thus correct to conclude that the govern-
ment properly relied on Exemption 1 to withhold the
videotapes and photographs in their entirety. Accord-
ingly, its judgment should be affirmed.

4

## Jurisdictional Statement

The district court had jurisdiction over this FOIA action pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331. The district court entered final judgment for the defendants on September 17, 2013. (Joint Appendix ("JA") 1375). CCR filed a timely notice of appeal on September 30, 2013. (JA 1376). Accordingly, this Court has jurisdiction under 28 U.S.C. § 1291.

## Issue Presented for Review

Whether the district court correctly deferred to DoD's determination that videotapes and photographs of al Qahtani were properly classified and exempt from disclosure pursuant to FOIA Exemption 1, 5 U.S.C. § 552(b)(1), where DoD provided multiple declarations, each providing separate and independent explanations of the harm to national security that could logically and plausibly result from the release of the videotapes and photographs.

## Statement of the Case

### A.   Procedural Background

On January 9, 2012, CCR filed a complaint seeking the release of classified videotapes and photographs of al Qahtani under the Freedom of Information Act, and naming as defendants DoD and its components the Defense Intelligence Agency and United States Southern Command ("SOUTHCOM"); the Department of Justice and its components the FBI and the Executive Office for United States At-

5

torneys (which was later dismissed voluntarily from the action); and the CIA.

Pursuant to an agreement between the parties, in May and June 2012, the remaining defendant agencies each provided declarations to CCR detailing the searches they had conducted, identifying the responsive records they had found, and describing the basis for withholding those records, or, in the case of the CIA, neither confirming nor denying the existence of responsive records.

On October 3, 2012, CCR filed a motion for partial summary judgment against DoD and the FBI. On December 21, 2012, the government cross-moved for summary judgment on behalf of all defendants. On September 12, 2013, the district court entered a memorandum and order granting the government's motion for summary judgment on the basis of FOIA Exemption 1. The district court did not reach the additional FOIA exemptions asserted by the government. Final judgment was entered on September 17, 2013, and this appeal followed.

## B. Factual Background

### 1. The FOIA Requests and the Responsive Records

On March 4, 2010, CCR sent FOIA requests to DoD, SOUTHCOM, DOJ, FBI, and CIA seeking three categories of records: (1) videotapes of al Qahtani made between February 13, 2002, and November 30, 2005; (2) photographs of al Qahtani made between February 13, 2002, and November 30, 2005; and (3)

6

any other audio or visual records of al Qahtani made between February 13, 2002, and November 30, 2005. (JA 22).

After conducting thorough searches, DoD and DOJ collectively identified fifty-six videotapes and six photographs of al Qahtani.[1] Fifty-three videotapes were located in an investigative file in an FBI field office, and depict al Qahtani either alone in his cell or interacting with DoD personnel between August 2002 and November 2002 (the "FBI Videotapes"). The FBI provided detailed descriptions of these videotapes in an unclassified index, filed under seal ex parte and in camera before the district court. (Record Documents 55 (motion to file under seal), 62 (sealed document)). Of the remaining three videotapes, one contains two segments depicting separate incidents in which a DoD forcible cell extraction ("FCE") team removed al Qahtani from his cell after he refused to come out voluntarily (the "FCE Videotape"). The final two videotapes "document intelligence debriefings" of al Qahtani in July 2002 and April 2004 (the "Debriefing Videotapes"), and are described in detail in the classified Declaration of Mark Herrington, dated December 20, 2012, which also was filed ex parte and in camera (the "Classified Herrington Declaration").[2] Of the six

_____

[1] CCR did not challenge the adequacy of the government's search in the district court, nor has it raised the issue on appeal.

[2] The Classified Herrington Declaration is now held by the Court's Classified Information Security Officer for the Court's review.

photographs, four are forward-facing mug shots of al Qahtani, and two are profile photographs.

The CIA's response explained that the CIA could neither confirm nor deny whether it had any responsive records because "the fact of the existence or non-existence of requested records is currently and properly classified," as well as specifically exempted from disclosure by the CIA Act of 1949, as amended. CCR does not challenge the CIA's response on appeal.

## 2. The Government's Basis for Withholding the Responsive Records

The government determined that all of the responsive records, including the FBI Videotapes, the FCE Videotape, the Debriefing Videotapes, and the photographs (collectively, the "Withheld Videotapes and Photographs"), were currently and properly classified, and withheld them in full pursuant to FOIA Exemption 1. Exemption 1 exempts from disclosure records that are "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy," and "are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1).

In four declarations, including the Classified Herrington Declaration, DoD officials affirmed that the Withheld Videotapes and Photographs were properly classified under the criteria set forth in Executive Order 13,526. The declarations identified the three categories of information specified in that Executive Order that the records pertain to: "military plans, weapons systems, or operations," "intelligence activi-

8

ties (including covert action), intelligence sources or methods, or cryptology," and "foreign relations or foreign activities of the United States, including confidential sources." Exec. Order 13,526 § 1.4(a), (c), (d), 75 Fed. Reg. 707, 709 (Dec. 29, 2009); (JA 1286-87, 1298, 1306). In addition, the four declarations each provided independent explanations of the separate types of damage to national security that could reasonably be expected to result from the public disclosure of the Withheld Videotapes and Photographs. The three public declarations were submitted by Major General Karl R. Horst, then Chief of Staff of the United States Central Command, who was responsible for oversight of over 200,000 military personnel in the Middle East and Central Asia; Rear Admiral David B. Woods, then Commander of Joint Task Force, Guantánamo ("JTF-GTMO"), who was responsible for detention and interrogation operations at Guantánamo Bay, Cuba; and then-Deputy Assistant Secretary of Defense for Rule of Law and Detainee Policy William Lietzau, who was responsible for developing policy recommendations relating to individuals captured or detained by DoD. The classified declaration was submitted by Mark Herrington, an Associate Deputy General Counsel in DoD's Office of the General Counsel.

Two additional public declarations—also submitted by Herrington—provided further context to the government's invocation of Exemption 1. Those declarations further described the content of several photographs and the FCE videotape (JA 1291-92), and set forth the narrow circumstances in which the government has released detainee images (JA 1336-37).

9

The government also invoked FOIA Exemptions 7(A) and 7(C), which protect from disclosure law enforcement records whose disclosure could interfere with law enforcement proceedings or could constitute an unwarranted invasion of personal privacy, respectively, to withhold the 53 FBI Videotapes. In addition, the government invoked Exemption 6 to protect al Qahtani's personal privacy interests in all the Withheld Videotapes and Photographs. Finally, the government relied on 10 U.S.C. § 130b, which is an exemption statute under FOIA Exemption 3, to protect the identity of any DoD personnel in the Withheld Videotapes and Photographs.

## C.  The District Court's Decision

In a September 12, 2013, memorandum and order, the district court upheld the government's withholding of the responsive videotapes and photographs on the basis of FOIA Exemption 1, finding it "both logical and plausible that the disclosure of any portion of the Withheld Videotapes and Photographs could reasonably be expected to harm national security." (Special Appendix ("SPA") 24). In particular, the court found General Horst's explanation that "extremists would utilize images of al-Qahtani (whether in native or manipulated formats) to incite anti-American sentiment, to raise funds, and/or to recruit other loyalists" to be not only logical but "particularly plausible in this case," given the high-profile detainee involved. (SPA 25-26). In addition, the district court found it "entirely plausible that disclosure of the Withheld Videotapes and Photographs could compromise the Government's cooperative relationships with other

10

Guantanamo detainees," as set forth in Admiral Woods's declaration. (SPA 26). The district court also indicated in a footnote that DoD had provided "other plausible reasons for withholding the FCE Videotape and Debriefing Videotapes," but that it did not need to reach them as the reasons provided by General Horst and Admiral Woods were sufficient to withhold all of the records in their entirety under FOIA Exemption 1. (SPA 26).[3]

In response to CCR's contention that the government had released other detainee photographs without causing harm to the national security, the district court explained that the government has not released any images in which a specific detainee is identifiable, with the exception of photographs used for border control or military commission trials, and photographs taken by the International Committee of the Red Cross ("ICRC") and released solely to a consenting detainee's family. (JA 1336-37; Supplemental Appendix ("SA") 23). Furthermore, the district court observed that the government's prior disclosure of "written information concerning al-Qahtani does not diminish its explanations for withholding *images* of

_____

[3] The government had provided some of the additional reasons for withholding the Debriefing Videotapes in the Classified Herrington Declaration. The district court reviewed that declaration over CCR's objection, noting that courts' general reluctance to review ex parte submissions "dissipates considerably where, as here, national security concerns are at issue." (SPA 19 (internal quotation marks omitted)).

11

al-Qahtani," given that "the application of Exemption 1 is generally unaffected by whether the information has entered the realm of public knowledge." (SPA 27, 28 (internal quotation marks omitted)). The only exception to this general rule, the court noted, is if the government has already made public, through an official and documented disclosure, information that is as specific and that exactly matches the information being requested. (SPA 28). Given that the images of al Qahtani on the Withheld Videotapes and Photographs have never been officially disclosed, the district court concluded that the government properly withheld them pursuant to FOIA Exemption 1. (SPA 28-29).

Because the district court determined that the government properly relied on FOIA Exemption 1 to support its withholdings, it did not reach the other FOIA exemptions asserted by the government, namely FOIA Exemptions 3, 6, 7(A), and 7(C). Although the district court explicitly noted that it was not reaching "the Government's invocation of al-Qahtani's privacy interests," it commented that "al-Qahtani, unlike many other detainees, has not permitted the ICRC to take his photograph," and that "al-Qahtani's interest in avoiding further privacy invasions is entitled to considerable weight." (SPA 27 n.13). Despite CCR's insistence that al Qahtani willingly waived his privacy interests, the court was skeptical that he has "the legal capacity to effect such a waiver," given that a federal court in the District of Columbia found him incompetent to continue a habeas action there. (SPA 27 n.13).

12

The district court also recognized that there was no evidence to support CCR's "speculative suggestion" that "the Withheld Videotapes or Photographs depict illegal conduct, evidence of mistreatment, or other potential sources of governmental embarrassment." (SPA 29). Indeed, the court stated that it had "personally reviewed" the FBI's sealed ex parte index describing the FBI Videotapes, and confirmed that the records do not depict "any abuse or mistreatment." (SPA 29).

### Summary of Argument

The district court correctly upheld the government's assertion of Exemption 1 to withhold the responsive videotapes and photographs of al Qahtani because these records are currently and properly classified. *See infra* Point I. As an initial matter, the district court properly accorded substantial weight to the government's declarations. Decades of precedent firmly establish that the judiciary must defer to the executive's predictions of national security harm that may attend public disclosure of records so long as such predictions appear logical or plausible. CCR's attempt to upend this principle in favor of a stricter standard of review contravenes that long-settled law. *See infra* Point I.A.

The government's declarations explain in detailed and non-conclusory fashion that disclosure of any portion of the Withheld Videotapes and Photographs could reasonably be expected to harm national security in several ways. *See infra* Point I.B. First, the government explains that the disclosure of images of

13

al Qahtani could reasonably be expected to inflame anti-American sentiment and endanger the lives and physical safety of U.S. personnel and others in Afghanistan, as well as aid extremists in their recruitment and financing efforts. The district court properly deferred to this judgment, which is grounded in relevant past experiences as well as an assessment of the volatility of the region and the nature of our enemies. *See infra* Point I.B.1.

Second, the government explains that the disclosure of the Withheld Videotapes and Photographs could reasonably be expected to facilitate reprisals against al Qahtani's family members and associates, and chill the cooperation of other U.S. detainees at Guantánamo. The district court also properly deferred to this assessment, as it too was based on relevant historical experience, and is rendered all the more likely by the official written record of al Qahtani's cooperation with the United States. *See infra* Point I.B.2.

Although the district court did not reach the remaining rationales advanced by the government for withholding responsive images of al Qahtani, those rationales are also logical and plausible and provide separate and independent grounds to uphold the government's invocation of Exemption 1. As the government's declarants explain, release of images depicting al Qahtani in detention would be perceived as inconsistent with well-settled prohibitions contained in the Geneva Conventions and thus could reasonably be expected to undermine the United States' diplomatic and military relationships with its allies and part-

14

ners. In addition, permitting the release of imagery of detainees could allow detainees to convey coded messages to enemy groups to the detriment of the country's national security. *See infra* Point I.B.3.

None of these predictions of national security harm become illogical or implausible in light of the government's prior declassification of images of other detainees, which occurred in narrow circumstances to effectuate other security interests or as the result of a detainee's express consent to be photographed by the International Committee of the Red Cross. As the district court correctly observed, contrary to CCR's representation, the government's prior releases have been limited and do not undermine the rationales for continuing to protect images of al Qahtani specifically. *See infra* Point I.B.

Next, as to the FCE Videotape and Debriefing Videotapes in particular, the government has advanced additional plausible and logical rationales for withholding them under Exemption 1. As the government explains, public disclosure of the FCE Videotape documenting two forced cell extractions of al Qahtani would allow detainees to further develop counter-tactics to thwart forced cell extractions, notwithstanding the prior release of training materials. In addition, public disclosure of the FCE Videotape could also reasonably be expected to lead to more forced cell extractions by detainees seeking to publicly affirm their continued resistance to the United States. The government's additional reasons for withholding the Debriefing Videotapes are contained in a classified declaration. As each of these predic-

15

tions of potential national security harm is logical and plausible, each is entitled to substantial deference and independently justifies withholding of the FCE Videotape and Debriefing Videotapes specifically. *See infra* Points I.B.4 & I.B.5.

Finally, in the event this Court concludes that the district court should not have granted the government summary judgment pursuant to Exemption 1, the appropriate remedy is to remand this matter to the district court to rule on the applicability of other FOIA exemptions asserted by the government but not passed upon by the district court. *See infra* Point II.

## A R G U M E N T

### Standard of Review

This Court reviews a district court's grant of summary judgment in a FOIA action de novo. *Wilner v. NSA*, 592 F.3d 60, 69 (2d Cir. 2009).

### POINT I

### The Government Properly Withheld Classified Videotapes and Photographs of al Qahtani Under FOIA Exemption 1

### A. Legal Standard for Asserting FOIA Exemption 1

FOIA Exemption 1 exempts from disclosure records that are "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy," and

16

"are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Pursuant to Executive Order 13,526, information is properly classified if an original classifying authority classified the information; the information is owned by, produced by or for, or is under the control of the United States Government; the information "pertains to" one of eight categories of information specified in the Executive Order; and if its "unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national security." Executive Order 13,526, §§ 1.1, 1.4. Only the last of those criteria is at issue in this appeal.

An agency may carry its burden of proving the applicability of a FOIA exemption by declaration. *Wilner*, 592 F.3d at 72-73. Agency declarations are entitled to a presumption of good faith, *id.* at 69, and "'[s]ummary judgment is warranted on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith,'" *id.* at 73 (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)). "'Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible.'" *Wilner*, 592 F.3d at 73 (quoting *Larson*, 565 F.3d at 862); *id* at 75; *ACLU v. DOJ*, 681 F.3d 61, 69 (2d Cir. 2012); *ACLU v. DoD*, 628 F.3d 612, 619, 624 (D.C. Cir. 2011).

17

Where the claimed exemption implicates national security, a reviewing court "'must accord *substantial weight* to an agency's affidavit concerning the details of the classified status of the disputed record.'" *ACLU v. DOJ*, 681 F.3d at 69 (quoting *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007)). Although courts review an agency's withholding of information "de novo," 5 U.S.C. § 552(a)(4)(B), "*de novo* review in FOIA cases is not everywhere alike," *Ass'n of Retired Railroad Workers, Inc. v. U.S. Railroad Retirement Bd.*, 830 F.2d 331, 336 (D.C. Cir. 1987). With respect to national security matters, while de novo review provides for an objective, independent judicial determination, courts, recognizing "the uniquely executive purview of national security" and "the relative competencies of the executive and judiciary," "have consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review." *Wilner*, 592 F.3d at 76 (internal quotation marks omitted). "[T]he court is not to conduct a detailed inquiry to decide whether it agrees with the agency's opinions; to do so would violate the principle of affording substantial weight to the expert opinion of the agency." *Halperin v. CIA*, 629 F.2d 144, 148 (D.C. Cir. 1980); *accord Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990). It is thus "'bad law and bad policy to second-guess the predictive judgments made by the government's intelligence agencies.'" *ACLU v. DOJ*, 681 F.3d at 70-71 (quoting *Wilner*, 592 F.3d at 76); *see CIA v. Sims*, 471 U.S. 159, 179 (1985) (intelligence officials must "be familiar with 'the whole picture' as judges are not," and their decisions "are worthy of

18

great deference given the magnitude of the national security interests and potential risks at stake"); *Frugone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999) ("courts have little expertise" in international or intelligence matters, and may not dismiss "facially reasonable concerns").

CCR argues against this firmly established case law by citing selective excerpts of the legislative history of the 1974 amendments to FOIA, which enacted Exemption 1 in its current form. (Brief for Plaintiff-Appellant ("Br.") 20-33). But this Court and others have already considered the legislative history of that same bill, and reached the opposite conclusion. Indeed, the oft-repeated admonition that courts must accord "substantial weight" to the Executive's national-security justifications for withholding is taken directly from the Senate Conference Report for the 1974 amendments:

> the conferees recognize that the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects [sic] might occur as a result of public disclosure of a particular classified record. Accordingly, the conferees expect that Federal courts, in making de novo determinations in section 552(b)(1) cases under the Freedom of Information law, *will accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record.*

19

S. Conf. Rep. No. 93-1200, at 12, *reprinted in* 1974 U.S.C.C.A.N. 6285, 6290 (emphasis added); *see, e.g.*, *Halpern v. FBI*, 181 F.3d 279, 292 (2d Cir. 1999) (quoting italicized language); *Diamond v. FBI*, 707 F.2d 75, 79 (2d Cir. 1983) (citing same portion of conference report); *Center for Nat'l Security Studies v. DOJ*, 331 F.3d 918, 927 (D.C. Cir. 2003); *Krikorian v. Dep't of State*, 984 F.2d 461, 464 (D.C. Cir. 1993); *Weissman v. CIA*, 565 F.2d 692, 697 n.10 (D.C. Cir. 1977); *see also* 120 Cong. Rec. 36,870 (1974) (statement of Sen. Muskie) ("The judge would be required to give substantial weight to the classifying agency's opinion in determining the propriety of the classification.").[4]

---

[4] "Because a conference report represents the final statement of terms agreed to by both houses, next to the statute itself it is the most persuasive evidence of congressional intent." *Disabled in Action v. Hammons*, 202 F.3d 110, 124 (2d Cir. 2000) (internal quotation marks omitted). The isolated floor statements cited by CCR are not sufficient to overcome this authoritative statement of legislative intent, much less forty years of case law. In any event, the quoted floor statements do not necessarily contradict the idea that Executive determinations regarding national security deserve deference. For instance, if the 1974 amendments were intended to give FOIA "some teeth" (Br. 26), that was accomplished by adding provisions for de novo review of exemption claims and, if necessary, in camera inspection of records, 5 U.S.C. § 552(a)(4)(B), Pub. L. No. 93-502 § (b)(2) (1974)—but

20

Ultimately, the agency's rationale is accorded deference and need only "'appear[ ] logical or plausible.'" *ACLU v. DOJ*, 681 F.3d at 69 (quoting *Wilner*, 592 F.3d at 73). CCR attempts to raise that low threshold by relying on cases that dismiss litigation pleadings for lack of a facially plausible claim. (Br. 23, 40). But that argument ignores the vastly different contexts at issue. A plaintiff's complaint must be assessed under the Federal Rules of Civil Procedure by a court "draw[ing] on its judicial experience and common sense," to avoid placing the "burdens of discovery," which can be "disruptive" or "abus[iv]e," on a defendant. *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 684-86 (2009). In contrast, as described above, courts have recognized that claims of harm to national security are to be judged in light of the Executive's experience and judgment, not the courts'. Indeed, predictions of national security harm are inherently speculative, complex, and dependent upon a nuanced assessment of the threats, vulnerabilities, and potential consequences present in fluid factual circumstances. *See, e.g.*, *Judicial Watch v. DoD*, 715 F.3d 937, 943 (D.C. Cir. 2013) (agency statement of threatened national security harm "'will always be speculative to some extent'" (quoting *ACLU v. DoD*, 628 F.3d at 619)); *Larson*, 565 F.3d at 865 ("The judiciary is in an extremely poor position to second-guess the predictive

――――――――

as explained above, the de novo review Congress envisioned was independent and objective but at the same time respectful of the Executive's expertise and the Judiciary's lack of it.

21

judgments made by the government's intelligence agencies" regarding national-security questions (internal quotation marks omitted)); *cf. Sims*, 471 U.S. at 180 (Executive, not courts, are to "weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the . . . intelligence-gathering process."); *Halperin*, 629 F.2d at 149, 150. For those reasons, to demonstrate the applicability of Exemption 1, "the government's burden is a light one." *ACLU v. DoD*, 628 F.3d at 624; *accord Morley v. CIA*, 508 F.3d 1108, 1124 (D.C. Cir. 2007) ("little proof or explanation is required beyond a plausible assertion that information is properly classified").

CCR finally seeks to undermine the substantial deference due to the Executive's national-security judgment by accusing Executive Branch officials of systemically and habitually overclassifying information, such that there "is a better than half chance" that any single classification decision is "erroneous." (Br. 29-33). But the government's classification decisions are entitled to a presumption of regularity, *see, e.g.*, *Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1368 (4th Cir. 1975), and this case should be decided based on whether the government has met its burden here, not on questionable claims of the probabilities that some other sets of information may or may not be properly classified. Indeed, this Court has given no weight to similar "cynicism that the withheld materials may damage our nation's security." *Diamond*, 707 F.2d at 79 (citing *Military Audit Project v. Casey*, 656 F.2d 724, 753-54 (D.C. Cir. 1981) ("emphatically reject[ing]" argument that later determination that

22

classification of some documents is not necessary vitiates claims of continuing need for secrecy for others)). CCR's suggestion that this Court should look skeptically at Executive Branch classification decisions conflicts with the Supreme Court's longstanding instruction that courts afford "great deference" to the national-security judgments of Executive Branch officials. *Sims*, 471 U.S. at 179.

## B.  The Government Has Met Its Burden to Show the Withheld Records Are Exempt Under Exemption 1

The district court correctly applied these Exemption 1 standards. On appeal, CCR challenges the government's assertions that the disclosure of the Withheld Videotapes and Photographs "could reasonably be expected to cause identifiable or describable damage to the national security," arguing that potential harm identified and described in DoD's declarations is neither logical nor plausible. Those arguments are incorrect. In four separate declarations, DoD has laid out several separate and independent bases for its determination that the disclosure of the Withheld Videotapes and Photographs could reasonably be expected to cause harm to the national security. If the Court concludes that any one of these explanations is logical or plausible, it must uphold the government's withholdings.

23

### 1. The Government Has Logically and Plausibly Established That Release of the Withheld Videotapes and Photographs Could Reasonably Be Expected to Harm National Security by Inciting Anti-American Violence and Endangering Lives

First, the government has established, through the declaration of General Horst, that U.S. national security could be harmed by disclosure of the Withheld Videotapes and Photographs, which he reasonably predicted may lead to anti-American violence and strengthen extremist enemies of the United States.

In his declaration, General Horst explains in detail three ways in which release of the Withheld Videotapes and Photographs could reasonably be expected to harm national security: (1) by endangering the lives and physical safety of three categories of individuals—military personnel and contractors from the United States or its partner countries who are currently serving in Afghanistan or at DoD detention facilities, Afghan military and civilian personnel, and U.S. diplomats and aid workers; (2) by adversely affecting security conditions throughout the Middle East and Central Asia, including in Afghanistan; and (3) by aiding in the recruitment and financing of extremists and insurgent groups. (JA 1299).

Contrary to CCR's repeated assertions, General Horst does not claim that "*any* depiction of *any* detainee in U.S. custody endangers national security." (Br. 33). Rather, he notes specifically that it is the release of the videotapes and photographs of al Qahtani at issue in this case that could reasonably be ex-

24

pected to harm national security. (JA 1299, 1301-03).
Not only is General Horst's declaration specific to the
Withheld Videotapes and Photographs, but the dis-
trict court in fact noted that General Horst's justifica-
tion for classifying these records was "particularly
plausible in this case," recognizing that al Qahtani is
"a high profile detainee." (SPA 25-26).[5]

General Horst's predictions of national security
harm are not hypothetical but rooted in past experi-
ence. General Horst notes, for example, that the re-
lease of other photographs and information about de-
tainees has led to riots in which U.S. soldiers and ci-
vilians have lost their lives. (JA 1299-300). CCR fo-
cuses on certain of the specific examples provided by
General Horst, criticizing "false analogies" to depic-
tions of "abuse" and "cultural insensitivity," given
that the government has affirmed that the Withheld
Videotapes and Photographs do not depict any abuse
or mistreatment. (Br. 35). But CCR misses the point.
These past examples inform General Horst's predic-
tive judgment regarding the potential for national se-
curity harm from the release of images depicting al
Qahtani, a high profile detainee. They are not offered
as precise analogies, but as illustrations of the risks,
and they do not define a rigid standard for determin-
ing whether or not a particular videotape or photo-
graph is properly classified. *See Judicial Watch*, 715
F.3d at 943 ("[A]ny affidavit or other agency state-

―――――――――

5   CCR also recognizes al Qahtani's status as a
high profile detainee. (Br. 3 (noting "obvious public
interest in . . . al-Qahtani in particular")).

25

ment of threatened harm to national security will always be speculative to some extent." (internal quotation marks omitted)). Indeed, General Horst makes clear that these examples demonstrate the "tenuous nature of security" in the region. (JA 1300).

In any event, contrary to CCR's representation, General Horst does not suggest that these specific examples were the only incidents that led to dangerous and even lethal unrest in the region, explaining simply that enemy forces have "previously used videos and photographs out of context," including "photographs of U.S. forces interacting with detainees" to "incite violence, promulgate extremist recruiting and garner support for attacks against U.S. forces" and others. (JA 1300-01). General Horst also specifically explains that "manipulation of visual imagery depicting DOD treatment of detainees has been used in the past to increase recruitment by extremist groups, as a fund-raising tool for extremist groups, and to encourage solidarity among extremist groups." (JA 1302). He notes that these enemy tactics "have resulted in the deaths and injury of U.S. and [International Security Assistance Force ('ISAF')] service members." (JA 1301). In other words, the harm to national security that has resulted from past DoD experience involving the release of certain photographs of detainees—the deaths of U.S. military personnel and others—is real.[6]

––––––––––

[6]  CCR attacks General Horst's rationale by asserting that "any picture" could be manipulated to cast the United States in a negative light. (Br. 39).

26

Accordingly, relying on his personal experience, "intimate familiarity of the current fragile situations in Pakistan, Afghanistan and other locations" in the region (JA 1303), and "extensive personal knowledge" of the "enemies who threaten United States Forces, International Security Assistance Forces, and Afghanistan Forces and interests," as well as the "assessments of [his] subordinate commanders, and the historical precedents" discussed in his declaration (JA 1297), General Horst explains that "enemy forces in Afghanistan" and throughout that region "would likely utilize the Withheld Videotapes and Photographs" to incite the civilian population and influence government officials. (JA 1300). He concludes that "[a]ny release of any portion of the Withheld Vide-

———————

But they ignore General Horst's specific statement that images similar to the ones at issue in this case have been used in ways that have harmed national security in the ways General Horst explains may occur here if the documents are released. While it may be true that any image can be altered, indeed an image can be entirely fabricated, in a way that would depict the United States negatively, that is no reason to conclude that it was improper for the government to classify images of the type that, as shown by historical experience, have been used for that purpose. In short, there is no reason that the existence of technology allowing alteration of photographs requires that the government make that job easy for extremists by providing them with images of detainees in custody.

27

otapes and Photographs would facilitate the enemy's
ability to conduct information operations and could be
used to increase anti-American sentiment thereby
placing the lives of U.S., ISAF, and Afghanistan ser-
vice members at risk." (JA 1301). He further warns
that "release of these videos and photographs could
reasonably be expected to adversely impact the politi-
cal, military and civil efforts of the United States,"
"provid[e] a recruiting tool for insurgent and violent
extremist groups," as well as "destabilize[e] partner
nations." (JA 1303). Based in part on DoD's past ex-
periences, General Horst's evaluation of the potential
damage to national security that could reasonably be
expected to result from the release of the Withheld
Videotapes and Photographs is certainly both logical
and plausible. The district court correctly deferred to
General Horst's national security expertise.

CCR speculates that the Withheld Videotapes and
Photographs are not in fact properly classified be-
cause (1) DoD has allowed the release of some other
detainee images, (2) DoD's arguments could also be
made with respect to an unlimited number of unspec-
ified future records that the government may choose
to withhold as classified in the future, and (3) records
cannot be classified to "conceal[ ] illegal conduct."
(Br. 34). All of CCR's arguments are unavailing.

As an initial matter, CCR is incorrect that DoD
"routinely releases or permits the release of images of
Guantanamo detainees without incident." (Br. 38). In
fact, as the district court recognized, DoD only releas-
es images of specifically identifiable detainees in cer-
tain limited circumstances, including as required for

28

border control and military commission purposes
(SPA 27; JA 1336-37; SA 23), and when taken by the
ICRC in accordance with DoD policy and released to a
consenting detainee's family (SPA 27; JA 1336-37;
SA 23). Other disclosed images that CCR points to
are of unidentifiable detainees. (JA 665-72, 788-800,
834; SA 18). The government does not release ICRC
photographs to the public, and in any event, al
Qahtani has not allowed the ICRC to photograph
him. (JA 1311, 1336-37).[7] Nor would his consent to
such a process diminish the national security harms
that are reasonably likely to flow from the disclosure
of the materials at issue in this case, which include
videotapes that depict far more than a facial image.

_____

[7]   CCR points to the release of certain detainee
photographs in another FOIA case, *International
Counsel Bureau v. DoD*, No. 08-1063 (D.D.C.). (Br. 38,
50). But as explained in the government's papers in
that matter and by a declaration in this case, the de-
tainees depicted in those photographs had consented
to having the ICRC take their photographs and re-
lease them to their families; accordingly, applying its
policy of case-by-case declassification in furtherance
of that lawful purpose, DoD permitted the release of
similar photographs depicting the detainees' like-
nesses. (JA 803-04, 1336-37). That DoD has made a
limited case-specific exception to its general practice
of classifying detainee images does not undermine its
rationale for that practice; in any event that fact is
irrelevant here as al Qahtani has declined to allow
the ICRC to take his photograph. (JA 1311, 1337).

29

CCR contends that because DoD has allowed the release of some images, General's Horst determination that the release of the Withheld Videotapes and Photographs could harm national security is somehow undermined. (Br. 38-39). That contention is without merit. Contrary to CCR's overbroad reading of General Horst's declaration, General Horst has not stated that the release of any photograph of any detainee would harm national security; instead, he has assessed the harms that could occur from the release of the photographs and video images of al Qahtani at issue here. (JA 1299-303). The government's release of other photographs of other detainees, in the narrow circumstances in which DoD permits such disclosures, does not compel the release of these particular videotapes and photographs of al Qahtani. *See ACLU v. DoD*, 628 F.3d at 625 ("[W]e have repeatedly rejected the argument that the government's decision to disclose some information prevents the government from withholding other information about the same subject."); *Center for Nat'l Security Studies*, 331 F.3d at 930-31 (rejecting argument that the government's release of some detainees' names estopped the government from withholding the names of other detainees); *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 835 (D.C. Cir. 2001) ("we reject [plaintiff's] contention that by releasing some photographs . . . , the government waived its right to withhold any others.").

The Withheld Videotapes and Photographs, which are described in the government's declarations, depict far more than the types of photographs that DoD has allowed to be released in the past. (JA 665-72, 788-

30

800, 834); *see ACLU v. DOJ*, 681 F.3d at 76 ("a photograph depicting a person in CIA custody discloses far more information than the person's identity"; upholding withholding of photograph of detainee Abu Zubaydah). They include images of a specifically identifiable "high profile detainee" (SPA 26) inside his cell, and being forcibly extracted from it (JA 1292, 1323). While CCR may disagree with General Horst that these images could reasonably be expected to harm national security, this difference of opinion does not render General Horst's determinations regarding the proper classification of these records any less logical or plausible, nor any less deserving of deference. *Diamond*, 707 F.2d at 79 n.6 (rejecting argument that materials "do not in [requester's] opinion exhibit any significant connection to national defense or foreign policy"); *Gardels v. CIA*, 689 F.2d 1100, 1105 (D.C. Cir. 1982) ("test is not whether the court personally agrees" with agency's evaluation of danger).[8]

_____

8    CCR maintains that there is no difference between the release of identifiable and unidentifiable images for the purpose of enemy propaganda. (Br. 38-39). But it is merely a matter of common sense that a person hostile to the United States may find particular propaganda value in the image of a specific detained person, as opposed to generalized images of unidentifiable people. *Cf. Judicial Watch*, 715 F.3d at 943 (noting that declarants were not making predictions about "just any images" but about the founder and leader of al Qaeda).

31

Nor is General Horst's logical and plausible explanation "without limit," as CCR argues. (Br. 39-43). The issue is not whether DoD could possibly make a similar argument with respect to future, as-yet-unknown documents regarding various aspects of U.S. foreign policy, but whether DoD's position with respect to the particular Withheld Videotapes and Photographs at issue in this case is logical and plausible. *See Judicial Watch v. DoD*, 857 F. Supp. 2d 44, 63 (D.D.C. 2012) (concerns about "potentially unlimited withholdings" regarding propaganda and inflammation of anti-American sentiment are unwarranted, as future arguments regarding propaganda "will only pass muster where, as here, they are sufficiently detailed and both plausible and logical"), *aff'd on other grounds*, 715 F.3d 937, 943 (D.C. Cir. 2013); *International Counsel Bureau v. DoD*, 906 F. Supp. 2d 1, 7 (D.D.C. 2012) (rejecting argument that propaganda value of images was too hypothetical to support classification, noting that "context matters," and finding DoD's explanations plausible and nonconclusory). Here, where General Horst's declaration addresses a particular set of videotapes and photographs of a particular high-profile detainee, in the context of other incidents where insurgents and extremist groups have used images of DoD interacting with detainees to incite violence and for propaganda purposes, in a volatile region where U.S. military personnel are actively engaged, General Horst's explanation of the harm to national security that could reasonably be expected to occur from the public release of the Withheld Videotapes and Photographs is logical and plausible. Indeed, as this Court has stat-

32

ed, "threats which are individually speculative but which can reasonably be expected with respect to large populations . . . of course are characteristic of the national security sphere." *ACLU v. DoD*, 543 F.3d 59, 72 (2d. Cir. 2008), *vacated on other grounds*, 558 U.S. 1042 (2009) (remanding for consideration of interceding statute).[9]

Finally, CCR suggests—based upon nothing more than speculation—that the Withheld Videotapes and Photographs depict "illegal conduct" or "abuse or mistreatment," or were impermissibly classified "to shield wrongdoing or avoid embarrassment." (Br. 34, 36, 37 n.14). But the record is abundantly clear that the government has not done so in this case. The government has affirmed that these records "ha[ve] not been classified in order to conceal violations of law, inefficiency, or administrative error; prevent embarrassment to a person, organization or agency; restrain competition; or prevent or delay the release of information that does not require protection in the

—————

9   In *ACLU v. DoD*, this Court rejected the government's assertion that Exemption 7(F) bars disclosure of detainee photographs on the grounds such release could reasonably be expected to incite violence against U.S. military personnel abroad. But the Court noted that "a powerful reason" it did not construe Exemption 7(F) broadly to cover this asserted harm was that FOIA provides, but the government in that case did not invoke, Exemption 1, "specifically tailored to the national security context." 543 F.3d at 72. Here, DoD has invoked that very exemption.

33

interest of the national security," in accordance with
Executive Order 13,526 § 1.7(a). (JA 1287). That dec-
laration is entitled to a presumption of good faith in
the absence of evidence to the contrary. *Wilner*, 592
F.3d at 75. And, as the district court agreed, no such
evidence exists: "contrary to CCR's speculative sug-
gestion, there is no evidence that any of the Withheld
Videotapes or Photographs depict illegal conduct, ev-
idence of mistreatment, or other potential sources of
governmental embarrassment." (SPA 29). The district
court then went on to "confirm the Government's pub-
lic representation that these records do not document
any abuse or mistreatment." (SPA 29 (internal quota-
tion marks omitted)). CCR denigrates that conclusion
by alleging the record is "insufficient" (Br. 36); but
the district court reviewed "the FBI's individualized
description of the FBI Videotapes" (SPA 29), as well
as the ex parte Classified Herrington Declaration,
which addresses the two Debriefing Videotapes
(SPA 19 n.10). Finally, the FCE Videotape is de-
scribed in detail in the public Declaration of Mark
Herrington. (JA 1291-92). Thus, CCR's attempt to
discount General Horst's explanation of harm based
on its continued repetition of unfounded and discred-
ited speculation that the government is "concealing
illegal conduct behind its classification stamp" is
without merit. (Br. 34-35).

General Horst's declaration, detailing the gov-
ernment's predictions of harm to national security if
the records at issue were to be released, is in itself
sufficient to justify the application of Exemption 1.
The district court's judgment may be affirmed on that
basis alone.

34

### 2. The Government Has Logically and Plausibly Established That Release of the Withheld Videotapes and Photographs Could Reasonably Be Expected to Harm National Security by Facilitating Retribution Against al Qahtani and Compromising Relationships with Cooperative Detainees

Additionally, as the district court correctly determined, Admiral Woods described yet other "entirely plausible" national security harms that could reasonably be expected to flow from public disclosure of the Withheld Videotapes and Photographs (SPA 26), including facilitating retribution from terrorists who may use al Qahtani's image to identify and target him, his family, and his associates; and exacerbating detainees' fears that the United States is unwilling or unable to protect its cooperative relationships, thus discouraging their cooperation with the government's intelligence-gathering efforts. CCR's arguments that these assessments are "neither logical nor plausible" and indeed "def[y] common sense" (Br. 50) rest upon a misreading of the Woods Declaration and overlook the critical distinctions between official public disclosure of images and written information.

It is beyond dispute that securing and maintaining the cooperation of detainee intelligence sources at Guantánamo is "critical" to ongoing efforts to protect the United States from terrorist threats. (JA 1283-84). It is also indisputable—and a matter of common sense—that current and potential intelligence sources will rarely furnish intelligence information

35

unless they are confident that the government "can and will do everything in its power" to prevent the public disclosure of information suggesting their cooperation with the United States. (JA 1284); *see Sims*, 471 U.S. at 175-76 (intelligence sources will "close up like a clam" if identities revealed). As Admiral Woods explains, revelation of information even suggesting that a detainee has cooperated with the United States, whether true or not, has led to retaliation from those who believe the detainee may have provided information about them. (JA 1284, 1285). Thus, the government's willingness and ability to protect its cooperative relationships with detainees and ease their fears of reprisal is vital to the success of the government's human intelligence collection effort at Guantánamo. (JA 1283-85).

In particular, the government's willingness and ability to protect detainee images from public disclosure is necessary to avoid discouraging detainees from cooperating with the United States. (JA 1284-86). If potential sources doubt the government's ability to protect their cooperative relationships, or fear that sources' identities will be disclosed, their willingness to cooperate will be diminished; to avoid that harm to national security, the government must apply a policy against disclosing detainee images as consistently as possible. (JA 1285-86). Additionally, as the district court recognized, unlike the release of a detainee's name or personal information in written form, public disclosure of a detainee's image enables terrorists to confirm the detainee's identity and more easily identify and target the detainee's family and associates. (SPA 26); *accord Associated Press v. DoD*,

36

462 F. Supp. 2d 573, 575-76 (S.D.N.Y. 2006) (uphold-
ing withholding of detainee images under Exemp-
tion 1; "photographs will increase the risk of retalia-
tion because release of photographs coupled with
names (which may be common names) would specifi-
cally identify each detainee in a way that a release of
names and other biographical information does not,
and . . . in any event, many detainees *believe* that
harm will ensue from such disclosure and will fail to
cooperate" (internal quotation marks omitted));
(JA 1284-85). In other words, disclosure of images
specifically is likely to exacerbate fears of reprisal
and make it less likely that detainees will provide in-
telligence information. (SPA 26 (citing JA 1285; *Asso-
ciated Press*, 462 F. Supp. 2d at 576); JA 1284-85;
SA 4, 5, 16).

None of CCR's arguments demonstrate that these
national security assessments are implausible or il-
logical. First, CCR contends that it is illogical that
the government's release of al Qahtani's image (or
any detainee's image) would suggest his cooperation
with the United States. (Br. 45-46; *see also id.* at 15-
16). But the harm to national security does not de-
pend on whether an image standing alone proves its
subject's cooperation. As Admiral Woods explains, "in
some cases persons who are captured and detained
and have not cooperated are nonetheless subject to
retribution because entities and individuals about
whom they have information suspect that they have
[cooperated] or are cooperating with the United
States." (JA 1284). The salient point is that hostile
forces *assume* that an individual who is captured and
in the custody and control of the United States is co-

operating with the United States government (whether true or not). This contention is not theoretical or hypothetical, but based on actual past experiences. (JA 1284; SA 4). Official public disclosure of detainee images would assist hostile forces by confirming the facts upon which they base their assumption of cooperation, namely, the detainee's identity and the fact of his detention by the United States. (JA 1284-85). This is true regardless of the form of the detainee image, whether it is a mug shot, a videotape of the detainee in his cell, or a videotape of a forced-cell extraction of the detainee. All of those images confirm the detainee's identity and the fact that he is in the United States' custody and control, and thus each provides the factual basis on which a terrorist may assume that a detainee is providing the United States government with intelligence information.[10]

Nor does the government's official written acknowledgment of al Qahtani's cooperation undermine

———————

[10] Admiral Woods also explains the common-sense proposition that the public release of a detainee's image after the detainee has been released from United States custody places the life of the detainee himself in danger (in addition to his family and associates). (JA 1284-85). While CCR notes that this rationale does not apply specifically to al-Qahtani, who remains in custody (Br. 46), it supports the government's general policy of refusing to publicly release detainee images, even with respect to individuals no longer in custody.

38

the plausibility of Admiral Woods' national security assessments. (Br. 47-49). CCR has failed to grasp what this Court and others have recognized—that there is a material difference between public disclosure of images and public disclosure of written records. *See, e.g.*, *ACLU v. DOJ*, 681 F.3d at 76 ("[A] photograph depicting a person in CIA custody discloses far more information than the person's identity."); (SPA 27 (quoting *Judicial Watch, Inc. v. DoD*, 857 F. Supp. 2d 44, 48 (D.D.C. 2012) ("A picture may be worth a thousand words. And perhaps moving pictures bear an even higher value."))).

Notwithstanding the official release of written information documenting al Qahtani's cooperation with United States authorities, official public disclosure of his image would facilitate retribution against previously unidentified associates and family members who can then be identified based upon the image. (JA 1284-85; *cf.* SA 4, 5); *see Associated Press*, 462 F. Supp. 2d at 575-76. Moreover, contrary to CCR's argument, logic dictates that it is even more likely that hostile elements will take retaliatory action against al Qahtani's family members and associates—some of whom may also be potential intelligence sources (JA 1285-86)—in light of the fact that al Qahtani's extensive cooperation with the United States is publicly known. (*Cf.* SPA 27).[11] And regardless of these

_____

[11] CCR again relies on prior releases of photographs to assert that there is no risk of dissuading detainee cooperation if the Withheld Videotapes and Photographs were to be disclosed. (Br. 49-50). As ex-

39

consequences, disclosure of images would further the belief among potential cooperators that the United States cannot protect their identities, chilling their willingness to provide information. (JA 1284-86).

For all these reasons, the district court properly concluded that Admiral Woods' explanation of the national security harms that may flow from official public disclosure of the Withheld Videotapes and Photographs are logical and plausible, and thus entitled to substantial deference. Accordingly, this Court may affirm the district court's holding independently on this basis.

**3. The Government Has Logically and Plausibly Established That Release of the Withheld Videotapes and Photographs Could Reasonably Be Expected to Harm National Security by Undermining U.S. Diplomatic and Military Relationships and Facilitating the Sending of Coded Messages by Detainees**

While the district court did not specifically address Deputy Assistant Secretary Lietzau's declaration, it articulates additional logical and plausible harms to national security that provide independent reasons that the Withheld Videotapes and Photo-

─────────

plained above, CCR drastically overstates the degree to which such images have been released: the government generally considers detainee images classified, with only narrow exceptions applied in case-specific circumstances. *See supra* Point I.B.1.

40

graphs were properly classified and withheld pursu-
ant to Exemption 1. Specifically, Lietzau explains
that the release of individually identifiable detainee
images could undermine the United States' diplomat-
ic and military relationships with allies and partners
by causing them to question the United States' com-
mitment to its longstanding policy and practice of
shielding detainees from public curiosity, consistent
with the Geneva Convention Relative to the Treat-
ment of Prisoners of War (Third Geneva Convention)
and the Geneva Convention Relative to the Protection
of Civilian Persons in Time of War (Fourth Geneva
Convention). (JA 1305-06, 1307; SA 15-21). He also
explains that detainees could use released videotapes
of their detention to communicate outside of approved
channels by means of coded messages, including with
enemy forces. (JA 1306-07).

CCR does not dispute that the Geneva Conven-
tions "prohibit the release of imagery of individually
identifiable detainees without a legitimate purpose,"
or that acting in a manner that is not consistent with
this prohibition could undermine "diplomatic and mil-
itary relationships with allies and partners" and ul-
timately "dilute protections afforded U.S. service per-
sonnel in future conflicts." (JA 1308-09; *see also* SA 1-
21). Rather, CCR's sole argument is that these provi-
sions of the Geneva Conventions do not apply to al
Qahtani because he purportedly has consented to the
release of the Withheld Videotapes and Photographs,
as set forth in the declaration of Sandra Babcock,
who is acting both as counsel in this case and in al
Qahtani's habeas action in federal district court in
the District of Columbia. (JA 37-39). CCR suggests

41

that failing to recognize a waiver of the protection
against public curiosity is inconsistent with DoD's
practice of "allowing the ICRC to photograph consent-
ing Guantanamo detainees." (Br. 55-56 & n.29). But
that ignores the facts that the ICRC releases photo-
graphs only to detainees' family members, that the
ICRC process "permits detainees to exercise signifi-
cant control over appropriate release and distribution
of their images" (JA 1311), and that DoD permits the
ICRC, an impartial humanitarian organization, to
take the photographs with detainees' consent as "part
of its effort to ensure humane treatment of detainees"
(JA 1311; *see also* SA 7). Thus, even assuming al
Qahtani's consent is valid, the public release of fifty-
six videotapes and six photographs depicting al
Qahtani in detention is not equivalent to allowing the
ICRC to take individual staged photographs of de-
tainees with their consent and give them directly to
their family members. (SA 18). And in any event, al
Qahtani has not consented to being photographed by
the ICRC.

Regardless, although the district court did not
reach this issue, the court correctly expressed skepti-
cism that Babcock's declaration was sufficient to
waive al Qahtani's privacy interest in these images.
(SPA 27 n.13). Noting that al Qahtani's habeas case
is currently stayed "'because [he] is currently incom-
petent and unable to assist effectively in this case,'"
the district court observed that "it is highly doubtful
that al-Qahtani has the legal capacity to effect such a
waiver." (SPA 27 n.13 (quoting order in *al-Qahtani v.
Obama*, No. 05 Civ. 1971 (D.D.C. Apr. 20, 2012))).
Under all these circumstances, given al Qahtani's

42

clear lack of consent to ICRC photography and his questionable consent to release of other images, those images are properly classified as their release could call into question the United States' commitment to adhere to the standards of the Geneva Conventions, and accordingly could negatively affect the United States' foreign relations.

Regarding the potential that detainees may attempt to convey coded messages in images, CCR does not dispute that possibility, nor does CCR dispute that such coded messages could harm national security. Rather, CCR again incorrectly asserts that DoD has "repeatedly released detainee photographs." (Br. 55). But as discussed above, the government's prior releases of images were narrow and do not undermine its explanation of the possible harm to national security that may occur if the Withheld Videotapes and Photographs were made public. In addition, CCR suggests that this basis for classification is inapplicable because the Withheld Videotapes and Photographs "are more than a decade old." (Br. 55). But coded messages do not necessarily expire—for example, coded messages revealing information about U.S. interrogation tactics, treatment, or detention facilities could remain useful over time.

Lastly, CCR complains that DoD has not explained why it cannot "segregate the videotapes and photographs in a manner that would eliminate such a risk." (Br. 55). But, of course, the purpose of a concealed message is that it be concealed, and there is no way to know if the government could identify which portions of the Withheld Videotapes and Photographs

43

might contain such messages in order to effectively redact them.

All of the reasons set forth by Deputy Assistant Secretary Lietzau in his declaration are both logical and plausible. *See International Counsel Bureau*, 906 F. Supp. 2d at 6-7 (accepting the same arguments advanced here by the government as logical and plausible). Accordingly, application of Exemption 1 to the Withheld Videotapes and Photographs was proper based on these grounds.

### 4. The Government Has Established Logical and Plausible Reasons for Withholding the FCE Videotape

As to the FCE Videotape, the government has demonstrated additional logical and plausible reasons that it has been properly classified. Although the district court did not reach the issue (SPA 26 n.12), that videotape may also be withheld from disclosure under FOIA Exemption 1 for those other reasons.

First, Admiral Woods explains that public disclosure of two forced cell extractions of al Qahtani could allow detainees to develop tactics to thwart forced cell extractions. (JA 1285). CCR characterizes this rationale as "illogical" in light of official disclosures of training materials showing and describing the tactics and procedures used by an FCE team. (Br. 51). But CCR ignores the qualitative difference between the information revealed on the FCE Videotape and that revealed by training materials, and its argument conflicts with the well-settled principle that release of some information does not preclude the government

44

from withholding similar information under Exemption 1.

The information conveyed by observing forced cell extraction techniques as applied to a resisting detainee is qualitatively different than that conveyed by the descriptions and photographs of techniques and equipment contained in training manuals. *See ACLU v. DoD*, 628 F.3d at 620 (Exemption 1 applies to documents describing enhanced interrogation techniques applied to detainees notwithstanding official disclosure of descriptions in Office of Legal Counsel memoranda of enhanced interrogation techniques, as descriptions reveal information of qualitatively different nature); *ACLU v. DoD*, 723 F. Supp. 2d 621, 629-30 (S.D.N.Y. 2010) (Exemption 1 applies to intelligence cables describing enhanced interrogation techniques, notwithstanding official disclosure of descriptions of enhanced interrogation techniques in OLC memoranda; former provides operational details concerning application of various techniques in various circumstances), *rev'd in part on other grounds*, 681 F.3d 61 (2d Cir. 2012). As such, public disclosure of the latter information does not necessarily require public disclosure of the former. *See Wolf*, 473 F.3d at 378 ("[T]he fact that information exists in some form in the public domain does not necessarily mean that official disclosure will not cause harm cognizable under a FOIA exemption."); *Wilson v. CIA*, 586 F.3d 171, 186-87 (2d Cir. 2009) ("widespread public discussion of a classified matter" does not imply official disclosure has occurred).

In this case, it is entirely plausible to expect that footage of actual forced cell extractions depicting the application of equipment and techniques against resisting detainees is reasonably likely to further enable the development of effective resistance techniques, notwithstanding that training materials are publicly available. Indeed, one district court has upheld the withholding of portions of videotapes of forced cell extractions on this basis. *International Counsel Bureau v. DoD*, 723 F. Supp. 2d 54, 63 (D.D.C. 2010); *see also International Counsel Bureau v. DoD*, 906 F. Supp. 2d at 7. Accordingly, the district court's holding that the FCE Videotape is properly protected pursuant to Exemption 1 can also be affirmed on this basis.

CCR also argues that portions of the videotape do not depict the application of FCE equipment or tactics and may be disclosed. (Br. 52). To the extent a segment of a video shows the FCE team but not al Qahtani, it would not be responsive to CCR's FOIA request, which sought only images of al Qahtani. (JA 22-23). And as regards those or any other segments, they would not be disclosable due to the national-security harms asserted above that support the withholding of any image of al Qahtani, as well as the other FOIA exemptions that the district court did not address.[12]

---

[12] CCR claims that the district court failed to make a segregability finding. (Br. 52). But the court noted that DoD's declarations support its assertion that "disclosure of *any portion* of the Withheld Vide-

46

Second, Lietzau explains that release of the FCE Videotape could harm national security by "encouraging disruptive behavior and potentially more violent behavior" by detainees "simply to confirm their continued resistance to the United States in the ongoing armed conflict . . . in the hope that such resistance would result in forced cell extractions that would be recorded by video and released to the public." (JA 1309, 1310). This in turn would "result in more opportunity for injury to both detainees and military personnel." (JA 1310). CCR concedes that it is "hypothetically conceivable" that this could happen, but disagrees that it is "plausible." (Br. 53-54). In drawing that elusive, even illusory, line, CCR merely seeks to substitute its own judgment for that of the government, whose predictions are entitled to the Court's deference. *ACLU v. DOJ*, 681 F.3d at 70-71; *Wilner*, 592 F.3d at 76.

For all those reasons, the FCE Videotape may properly be withheld under Exemption 1.

### 5. The Classified Herrington Declaration Logically and Plausibly Establishes That Release of the Debriefing Videotapes Could Reasonably Be Expected to Harm National Security

Finally, the Classified Herrington Declaration, which the district court properly considered ex parte, provides additional reasons that the two Debriefing

───────────

otapes and Photographs could reasonably be expected to damage national security." (SPA 19, 26 n.12).

47

Videotapes are classified and thus may be withheld under FOIA Exemption 1.

Ex parte review of classified declarations in FOIA cases is appropriate where a more detailed public explanation cannot be provided without revealing the very information that is sought to be protected. *See, e.g.*, *Weberman v. NSA*, 668 F.2d 676, 678 (2d Cir. 1982) (holding district court properly reviewed classified declaration ex parte because "[d]isclosure of the details of this affidavit might result in serious consequences to the nation's security operations"); *Krikorian*, 984 F.2d at 467; *Maynard v. CIA*, 986 F.2d 547, 557 (1st Cir. 1993); *Hayden v. NSA*, 608 F.2d 1381, 1385 (D.C. Cir. 1979); *cf. In re New York Times Co.*, 577 F.3d 401, 410 n.4 (2d Cir. 2009) (noting in proceeding to unseal wiretap and search warrant materials that although there are circumstances in which a nonpublic proceeding is appropriate, "courts seek to balance the need for transparency in the judiciary with the effective protection of sensitive information").

Although the district court noted that the contents of the Classified Herrington Declaration "were not necessary to our resolution of the instant motions" (SPA 19 n.10), that declaration provides additional reasons that the release of the two Debriefing Videotapes would be reasonably likely to harm national security. As laid out in the Classified Herrington Declaration, those reasons are both logical and plausible.

48

## POINT II

### If the Court Does Not Affirm on the Basis of FOIA Exemption 1, It Should Remand to the District Court to Rule on Other FOIA Exemptions

The district court did not reach Exemptions 3 (in conjunction with 10 U.S.C. § 130b), 6, 7(A), or 7(C), as it held that Exemption 1 was sufficient to protect the Withheld Videotapes and Photographs in their entirety. (SPA 16). In the event this Court concludes that the district court should not have granted the government summary judgment on the basis of Exemption 1, the appropriate remedy is not to instruct the district court to enter summary judgment in CCR's favor, as CCR requests. (Br. 59). Rather, as the government also invoked other FOIA exemptions, which independently justify withholding the Withheld Videotapes and Photographs, the appropriate remedy would be to remand to the district court to rule upon the applicability of these other FOIA exemptions.[13]

––––––––––

[13] As the government noted in the district court, the Protected National Security Documents Act of 2009 (section 565 of the Department of Homeland Security Appropriations Act, 2010, Pub. L. No. 111-83, 123 Stat. 2142) exempts from FOIA certain records where the Secretary of Defense certifies that disclosure of the records would "endanger citizens of the United States, members of the United States Armed Forces, or employees of the United States Government deployed outside the United States." The rec-

49

In particular, the district court did not reach Exemption 6, which exempts information whose disclosure would constitute a clearly unwarranted invasion of personal privacy, or Exemption 7(C), which exempts similar personal information in law enforcement records. Nor has CCR challenged DoD's assertion of those exemptions on appeal: while CCR mentions Exemptions 6 and 7(C), apparently in conjunction with its contention that al Qahtani's purported waiver of his privacy interests vitiates the government's interest in complying with the Geneva Con-

_____

ords encompassed within the provision include "photographs" and "video tapes" created between September 11, 2001, and January 22, 2009, that "relate[] to the treatment of individuals engaged, captured, or detained after September 11, 2001, by the Armed Forces of the United States in operations outside of the United States." *Id.* § 565(c)(1)(B), (c)(2). Such certifications expire after three years and may be renewed. *Id.* § 565(d)(2). The videotapes and photographs at issue in this case meet this statutory definition, and therefore, if they are certified by the Secretary of Defense, would be exempt under FOIA Exemption 3. However, the Secretary has not certified the records here, because DoD treats such certification as a last resort. DoD has reserved the right to pursue certification and, in the event of such a certification, to withhold the documents pursuant to Exemption 3 if other claims of exemption are not upheld. (Record Document 37 at 13 n.7). CCR did not oppose this reservation of rights in the district court.

50

ventions (Br. 56-58),[14] it does not mention the question in its "Issues Presented" or "Summary of the Argument," or develop any factual or legal arguments regarding the standards governing those two exemptions or their applicability here. (Br. 1, 13-17); *Yee v. City of Escondido*, 503 U.S. 519, 538 (1992) (courts do not consider questions not considered below); *Wit v. Berman*, 306 F.3d 1256, 1259 n.1 (2d Cir. 2002) (claims waived if not included in brief's "questions presented" (citing *Herrmann v. Moore*, 576 F.2d 453, 455 (2d Cir. 1978))); *Tolbert v. Queens College*, 242 F.3d 58, 75 (2d Cir. 2001) (issue abandoned when not listed in brief's issues presented and only discussed in footnote. Given that al Qahtani has a significant privacy interest in his identifying information, *see*

─────────

[14] For the government's response regarding the Geneva Conventions, *see supra* Point I.B.3. With respect to al Qahtani's waiver of his privacy interests under FOIA, while the government agrees that an individual may waive that interest, the district court was correctly skeptical whether CCR sufficiently established that al Qahtani did so here. The district court was right to doubt CCR's assertion that al Qahtani willingly waived his privacy interests, given that he has been found by another federal district court to be incompetent to assist effectively in his habeas case. (SPA 27 n.13). Moreover, CCR has offered only al Qahtani's attorney's statement that he has waived his rights, but DoD "policy regarding privacy interest waivers does not allow for third parties to attest to the wishes of the individual." (JA 1312).

51

*Associated Press v. DoD*, 554 F.3d 274, 286 (2d. Cir. 2009) (holding that detainees at Guantánamo have a privacy interest in personally identifying information in government records), if this Court disagrees with the district court's ruling on Exemption 1, it should remand for full consideration of the privacy-related arguments, and other applicable FOIA exemptions, by the district court in the first instance.

## CONCLUSION

**The judgment of the district court should be affirmed.**

Dated:    New York, New York
          March 21, 2014

                    Respectfully submitted,

                    PREET BHARARA,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for Defendants-Appellees.*

TARA M. LA MORTE,
EMILY E. DAUGHTRY,
BENJAMIN H. TORRANCE,
    *Assistant United States Attorneys,*
            *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of Rule 32(a)(7)(B). As measured by the word processing system used to prepare this brief, there are 11,622 words in this brief.

PREET BHARARA,
*United States Attorney for the*
*Southern District of New York*

By:  TARA M. LA MORTE,
*Assistant United States Attorney*